A. J. WIRTZ in Behalf of Himself and All Other Depositors of the Security State Bank of New England, an Insolvent Banking Corporation, Appellant, v. R. A. NESTOS, Governor of the State of North Dakota, Gilbert Semingson, State Bank Examiner of Said State, M. R. Porter, C. B. McMillan and S. G. Severtson, Constituting the Depositors Guaranty Fund Commission of Said State, Respondents and John Watson, a Depositor in the Tolley State Bank of Tolley, North Dakota, an Insolvent Banking Corporation, in Behalf of Himself and All Other Depositors of Said Bank Similarly Situated, Intervener.

(200 N. W. 524.)

**Banks and banking — guaranty fund law enacted pursuant to police power in public interest and for general welfare.**

1. The Guaranty Fund Law of 1917 was enacted pursuant to the police power in the public interest and for the general welfare.

Note—(1) Constitutionality of bank guaranty law, see annotation in 32 L.R.A. (N.S.) 1065; 3 R. C. L. 382; 1 R. C. L. Supp. 816.

(5) Suit against officer as suit against state, see 25 R. C. L. 413; 3 R. C. L. Supp. 1421; 5 R. C. L. Supp. p. 1329.

(8) Discretion of public officers not subject to review by courts, see 22 R. C. L. 490; 4 R. C. L. Supp. 1468; 5 R. C. L. Supp. 1207.

Constitutional law — rule stated for determining whether vested rights of depositors disturbed by statute amending original guaranty fund law.

2. Under the pleadings and in the absence of a showing that the claims of the plaintiffs had been allowed by the State Examiner and that the facts pertaining thereto had been certified to the Guaranty Fund Commission, as required by the Act of 1917, it is held, that no vested right or interest of the plaintiffs, as depositors in banks that closed after the Guaranty Act of 1917 went into effect, were disturbed by the legislature when chapter 200, Session Laws, 1923, was enacted.

Banks and banking — legislature in absence of statutory procedure of depositors to liquidate and certify claims to commission authorized to modify plan of original act as to order of payment.

3. Altho depositors, as plaintiffs contend, may, under the law of 1917, in some circumstances, have been entitled to payment in full out of the Guaranty Fund in the order in which banks closed, yet, since the State Examiner, the plaintiff, and others similarly situated with him, had not taken the required steps to determine, liquidate, and certify claims to the Guaranty Fund Commission, prior to the taking effect of the law of 1923, altho the Security State Bank and the Havelock Bank closed in November, 1920, it was competent for the legislature of 1923 to modify the plan of the original act so as to authorize the Guaranty Fund Commission, in its discretion, to pro rate payments upon claims of depositors in the numerous banks that had closed when the legislature convened, rather than to require payment in full to a few depositors, leaving the large majority to wait indefinitely.

States — statute held not to authorize action against guaranty fund commission or state by depositors of insolvent banks.

4. Section 8175, Comp. Laws, 1913, does not authorize a suit against the Guaranty Fund Commission or the State for the reason that the situation presented in the record does not arise upon contract, express or implied.

Banks and banking — guaranty fund commission merely agency for execution of policy of guaranty fund law; suit against guaranty fund commission as to certain matters held "suit against state".

5. The Guaranty Fund Commission is but an agency created by the legislature to execute a policy adopted by it in dealing with the problems arising out of the insolvency of banking corporations; the Fund is created through compulsory assessments and is used in the discharge of governmental functions; a suit against the Commission, as to matters pertaining to the exercise of judgment by it, in acting upon claims against the Guaranty Fund, or as to the time and manner of paying such claims or dividends thereon, is, in effect, a suit against the State; since the State did not give consent in either the act of 1917 or of 1923 that it be sued, such suit can not be maintained.

**Banks and banking — guaranty fund deemed created through exercise of taxing power.**

6. The assessment to create the Guaranty Fund is somewhat analogous to a special assessment and must be referred to the sovereign power to levy a tax. The assessment is levied for a public purpose and the fund is created through the exercise of the taxing power.

**Question as to use of guaranty fund to aid banks not decided.**

7. Whether the Guaranty Fund Commission may use the Fund temporarily to aid going banks or to salvage the assets of closed banks, for the benefit of the Fund, is not involved or decided.

**Banks and banking — constitutional law — discretion of commission under guaranty fund law in passing on depositor's claims cannot be controlled or directed by the courts.**

8. The Commission, under the law of 1923, is required to determine whether claims presented are valid and legal claims against the Guaranty Fund; under that law the Commission must exercise legal discretion and judgment in passing upon such claims; such discretion cannot be controlled or directed by the courts.

**Banks and banking — not held that depositors may in no case proceed against guaranty funds commission or its officers.**

9. It is held that the rule that an official duty, not involving the exercise of discretion, may be enforced when performance thereof is arbitrarily refused; and the other branch of the same rule that if a person will receive an injury, because an official is about to violate an official or legal duty for which adequate compensation cannot be had at law, such conduct may be enjoined, have no application to the facts presented in the record. It is not held that depositors may in no case proceed against the Guaranty Fund Commission or its officers. A depositor's constitutional rights of due process, equal protection of the law, and that the obligation of contracts shall not be impaired, are at all times open to vindication if infringed by the Commission, and he may doubtless have the relief to which a person in analogous cases may be entitled against fraudulent action or nonaction by the Guaranty Fund Commission, or its officers.

Opinion filed September 20, 1924.

Banks and Banking, 7 C. J. § 15 p. 484 n. 75, 77 New, p. 485 n. 79 New. Constitutional Law, 12 C. J. § 495 p. 959 n. 2 New. States, 36 Cyc. p. 911 n. 45; p. 914 n. 68.

Appeal from the District Court of Burleigh County, North Dakota, *Pugh, J.*

Affirmed.

*Charles Simon* and *Harvey Miller,* and *Crawford & Burnett,* for appellant.

The term public funds means taxes, customs, etc. appropriated by the government to the discharge of its obligations. Ayers v. Lawrence, 59 N. Y. 198.

A public fund within the rule of law which excused a trustee for liability for the trust fund, if invested in public funds, means government stocks or security depending for credit and security on the faith, solvency and stability of the government. 6 Words & Phrases, p. 5788.

The moneys of the state bonding fund do not belong to the state but are deposited in and held by the state treasurer in trust for the benefit and protection of those who under the terms of act may become claimants against such fund. In no event do such moneys become funds of the state. State ex rel. Lande v. Taylor, 33 N. D. 76, L.R.A. 1918B, 156.

That such fund is a special and not a public fund. State ex rel. Sterns v. Olson, 43 N. D. 619, 175 N. W. 714.

That the Bank Commissioner is a state officer has not been and cannot be questioned. That the depositors guaranty fund and the funds of a failed bank in the hands of a bank commissioner for the purpose of reimbursing the depositor's guaranty fund is as much a fund of the state as the common school fund is also true. State ex rel. Taylor v. Cockrell, 112 Pac. 1000.

It cannot be questioned that a judgment in the case in favor of the plaintiff in error would directly affect the state and would in effect be a judgment against the state and would require the subjection of state funds to satisfy said judgment, therefore it cannot be maintained. Lovett v. Langford, 145 Pac. 767.

The title of such depositors' guaranty fund vests in the state just as much so as common school lands or the proceeds of the sale of the same and the taxes levied and collected for the maintenance and support of said schools, all of which are held in trust by the State for a specific purpose.

*Divet, Holt, Frame & Thorp* and *John Thorpe,* Assistant Attorney General, for respondents.

The money referred to in said section is money belonging to the state which has been accumulated in the treasury as public funds, which are to be used in carrying on the state government. It means such money as is raised by taxation, or which has accumulated in the treasury by the payment of fees authorized by law to be charged for various purposes, or in any manner which would constitute such money a public fund of the state. The auditor's duties relate to the public funds of the state. State ex rel. v. Olson, 43 N. D. 619.

The case, it is true, has some differences from that at bar and the state was the owner of the property committed to the commissioners for disposition and was also the original debtor. Here the property is that of the contributing banks and is accumulated in the fund for the security of their respective depositors. These are differences, but there are substantial resemblances. Lankford v. Platte Iron Works (U. S.) 59 L. ed. 316.

It is left wholly with the commissioner of insurance to be paid only out of the bonding fund, and mandamus will not lie against the commissioner because the settlement of losses and liabilities involves, as we have shown, acts of judicial discretion and judgment not ministerial, and an action cannot be maintained against the bonding department for that is not an entity, and has only agreed to pay in case the commissioner says payment shall be made. State ex rel. v. Taylor, 27 N. D. 77.

It will be seen that the law has specifically confided to the banking board and the bank commissioner the duty and authority to determine the validity of claims against the depositors' guaranty fund. By this section it is not only their duty to determine when a claim is valid against the bank, but they must further determine whether such claim is protected and required to be paid from the depositors' guaranty fund. Lovett v. Lankford, 145 Pac. 770.

The powers of officers are classified as discretionary or ministerial. Over the former the courts have no control except when the discretion has been abused. Thus, if the power has been given to an officer to determine a question of fact his determination is final in the absence of any controlling provision of statute, provided he has not been guilty of an abuse of discretion. Such a determination is not ordinarily open to collateral attack in a court . . . but the exercise of min-

isterial powers is subject to the control of the courts, which may enforce their exercise through the right of mandamus. 29 Cyc. 1432.

Upon an investigation of the above matters this Board approves or disapproves the sale and on the approval depends the sale. If the board should have full control given it by statute certainly its approval should not be controlled by the courts. It is the approval of the board not of the courts upon which the question of the alienation of the state's property depends. The very act of approval, unless limited by the context of the statute providing therefor, imports the act of passing judgment, the use of discretion, and the determination as a deduction therefrom. Fuller v. University & School Lands, 21 N. D. 212.

It is not at all improbable that the proper location of the bank line of this grant may hereafter become the subject of judicial inquiry but at present while the matter is still pending before the land department and the officers are bringing to bear upon it their own judgment and discretion we have no right to interfere with their action by injunction. New Orleans v. Paine, 37 L. ed. 162; United States v. Black, 32 L. ed. 355, 357; Lankford v. State, 147 Pac. 1050, Action at law giving Keim v. United States, 44 L. ed. 774.

It must be kept in mind that the whole subject of guaranty deposits the very right to affect charters by casting the compulsory burden upon banks and to collect assessments and thus actually deprive parties of their property, is based upon the police power, and the right to legislate in regard to the subject must be tested by the limitations of that power. Noble St. Bank v. Haskell, 97 Pac. 590; Noble St. Bank v. Haskell (U. S.) 55 L. ed. 112.

To assume to vest judicial functions elsewhere than in the tribunal established by the Constitution is clearly without the sphere of legislative action, and statutes which attempt to confer judicial power upon the executive or ministerial officers are void. State v. Fisk, 15 N. D. 236; Bergen v. Nelson, 156 N. W. 559; Erickson v. Cass Co. 11 N. D. 495.

The general rule being that the right of a citizen to sue the state is a matter of grace that may be revoked by subsequent legislation. 36 Cyc. 915; Re Hoople, 179 N. Y. 308; Ex parte Alabama, 23 Am.

St. Rep. 567; Owen v. Branch Bank, 3 Ala. 258; Darrington v. Branch Bank, 13 How. 12, 14 L. ed. 30, 32; State v. Murray, 60 S. E. 935.

*Fisk, Murphy & Nash,* for interveners.

JOHNSON, J. This is a proceeding in equity by the plaintiff in his own behalf and in behalf of all others similarly situated as depositors in banks that have become insolvent and have closed, against the Depositors Guaranty Fund Commission, created pursuant to chapter 217, Session Laws, 1917 and chapter 200, Session Laws, 1923.

After alleging the membership of the Guaranty Fund Commission and the insolvency and closing of the Security State Bank of New England on November 17, 1920, the plaintiff, in substance, alleges the following matters: That the Guaranty Fund Commission was created to administer the Depositors Guaranty Fund Law, with power to make rules and regulations and with control of the fund collected for the purpose of paying depositors in insolvent banks; that, at the time when the Security State Bank of New England closed, the plaintiff had a deposit in the bank of $8059.00 and that he brings this action for himself and in behalf of all other depositors in that bank similarly situated, who have a common interest in the question and are too numerous to be brought in as parties plaintiff; that on the 17th of November, 1920, the said bank was declared insolvent and a receiver was put in charge of its affairs, with the usual powers with respect to the managing of its assets; "that the plaintiff duly presented his claim as an unsecured depositor *to the receiver* of said bank for the amount of $8059.00, the amount which he had on deposit at the time said bank was closed; which amount was duly *allowed by said receiver* as an unsecured deposit, and the same was *certified to the Depositors Guaranty Fund Commission for payment* out of the funds collected by said Commission and then held for payment of said deposits by law;" that the Commission refused and neglected to pay the amount of the deposit or to issue certificates of indebtedness against the Depositors Guaranty Fund in favor of the failed bank for the payment of the claim of this plaintiff and other depositors similarly situated, altho the Commission had sufficient funds on hand at that time to pay the same and have at all times since had sufficient funds to pay the unsecured depositors in said bank; that there are approximately $200,-000.00 of unsecured deposits in the bank "which have been duly

*allowed by the receiver* and certified to the Guaranty Fund Commission" and that the Commission has about $400,000.00 in the Guaranty Fund for the payment of unsecured depositors in the insolvent banks; "that the Security State Bank of New England, simultaneously with the Farmers State Bank of Havelock were the first banks to be declared insolvent of the numerous banks now in the hands of receivers, and its unsecured depositors entitled to be paid in the order of the priority of such insolvency and entitled to be paid in full out of the funds now held by the Guaranty Fund Commission for the payment of unsecured depositors in failed banks and said claim of the plaintiff, together with the other depositors similarly situated, is prior and superior to the claims of all other unsecured depositors in the other insolvent banks now in the hands of receivers." Plaintiff further alleges that he has no other speedy and adequate remedy at law and prays for judgment as follows: (1) that the Guaranty Fund Commission be ordered to pay to the receiver of the Security State Bank of New England the amount necessary to pay plaintiff's claim in full and also the claims of all other unsecured depositors similarly situated; (2) that if the Commission do not have sufficient funds on hand to pay all the unsecured depositors of the bank in full, it be directed to issue certificates of indebtedness in full against the Guaranty Fund, covering the claim of plaintiff and all other unsecured depositors similarly situated; (3) that the unsecured depositors of the Security State Bank of New England have a right prior and superior to the right of all other unsecured depositors in banks which became insolvent subsequent to the insolvency of the Security State Bank of New England; and (4) for such other relief as may seem just in the premises.

The answer is a voluminous document. It admits the membership of the Guaranty Fund Commission as alleged in the complaint, except that since the first of July, 1923, the manager of the Bank of North Dakota displaced the State Examiner as ex-officio member. It admits the corporate character of the Security State Bank of New England and that it became insolvent and was put in the hands of a receiver.

The facts and matters alleged in the answer may be briefly stated as follows:

(1). That the Guaranty Fund Commission is not subject to suit,

especially as to matters of judgment or discretion in determining the liability of the Guaranty Fund.

(2). That the claims of plaintiff, and of all others similarly situated, were never acted on by the State Examiner and by him certified with the net amount due thereon to the Guaranty Fund Commission, pursuant to the act of 1917.

(3). That no facts had been certified to the Guaranty Fund Commission by the State Examiner before this action was commenced, or before July 1, 1923, bearing on the question of the liability of the Guaranty Fund to the plaintiff.

(4). That the Guaranty Fund Commission has made no final determination upon plaintiff's claim since July 1, 1923, but that it is acting upon all claims of depositors as rapidly as possibly and consistent with careful consideration, with due regard to justice, both to the claimants and the Guaranty Fund; that over eighty banks had closed at the time the answer was interposed and that depositors' claims against the Fund aggregated about eight million dollars, all of which had to be examined by the Commission.

(5). That there is not enough money in the Guaranty Fund to pay the three banks that first closed; and that about eighty banks have closed since.

(6). That there are pending about twenty lawsuits against the Guaranty Fund Commission and that the funds of the Commission have been tied up in garnishment proceedings in numerous actions.

(7). That pursuant to the authority conferred by chapter 200, Sess. Laws 1923, a part of the Fund has been used to salvage assets of closed banks and is being otherwise used for the benefit of the Fund, as provided in the act; that the plaintiff denies the right of the Commission, under the act of 1923, to so use the Fund.

(8). That plaintiff asserts that the depositors in banks that closed prior to July 1, 1923, must be paid in the order in which the banks closed.

The answer concludes with a prayer (1) that the action cannot be maintained against the defendants and that the same be dismissed on the merits; (2) "that if it be not adjudged that said action cannot be maintained and dismissed on the merits that it be adjudged that the same abate as prematurely brought" so that the defendants may comply

with the provisions of the statute and perform the duties required of them by it; (3) that if the court hold that the Commission be not authorized to exercise judgment with reference to the care and disbursement of the fund and with reference to the validity of claims against it, that the court instruct and advise the Commission as to its powers and duties; (4) that a declaratory judgment as to the meaning and effect and validity of chapter 126, Session Laws 1917 and chapter 200, Session Laws 1923, with reference to all matters in dispute between the parties be made by this court, pursuant to chapter 237, Session Laws 1923.

The plaintiff demurred. The court held that the demurrer searched the record and sustained the demurrer to the complaint, but overruled the demurrer to the answer.

The basic theory of the plaintiff is that depositors in banks that closed prior to July 1, 1923, when the new or amended act went into effect, are, as a matter of law, entitled to payment from the Guaranty Fund in the order of time in which the banks closed. Manifestly, if the law does not thus prescribe the order of payment, and if the Commission have some discretion in that regard, and there has been neither fraud nor abuse in the exercise thereof, payment cannot be compelled by the courts contrary to the statute, or the decision of the Commission in the lawful exercise of its discretion.

On the oral argument in this court, some difference of opinion between counsel for the respective parties developed as to the correct construction of the complaint. Counsel for the appellant contended that the complaint should be construed to the effect that the claim of the plaintiff as an unsecured depositor in the bank had been presented to the State Examiner and by him allowed and, in effect, certified to the Guaranty Fund Commission as an unsecured claim; then, as a conclusion, it was urged that there remained only a ministerial duty for the Guaranty Fund Commission and its treasurer to perform, namely, that of drawing the checks to pay the claims of the plaintiff and other depositors similarly situated. It was, on the other hand, contended by counsel for the respondent that the trial court did not so construe the complaint; that all of the parties to this action construed it, and the proper construction of it is, to the effect that the plaintiff's claim had been submitted to the receiver of the bank and by him allowed and by-

him certified to the Commission; that the claims of plaintiff and those similarly situated with him had never, in fact, been submitted to the State Examiner and that no action by that officer had ever been taken thereon, pursuant to the requirements of the Depositors Guaranty Fund Law of 1917, or otherwise.

We are satisfied that respondent's contention is correct. We have italicised parts of the complaint which seem to point to the correct interpretation. The result is that something more than the performance of the ministerial duty of drawing a check or issuing a certificate remained to be performed before the treasurer of the Commission could be compelled to write a check in favor of the plaintiff. This interpretation leaves the complaint without an allegation of the essential fact that the State Examiner, under the law of 1917, the only person having authority to act upon claims against the Guaranty Fund, had acted upon the claim in suit, allowed it, and certified the fact of such allowance and the net amount due thereon, to the Commission. Section 15 of that act (1917) expressly provided that the State Examiner shall "certify to the Depositors Guaranty Fund Commission the amounts due to the several depositors of such insolvent banks and also, at the same time, certify any amounts that may be owing by said depositors to said bank, and the treasurer of the said Commission shall thereupon draw against the Depositors Guaranty Fund on deposit in the several banks in the amount thus certified and shall immediately transmit to such depositors the amounts due them, less any amounts that may be owing by said depositors to said bank." The performance of this duty could not be delegated to a receiver or any other person. It is clear that no duty to act on the part of the Commission arose merely because a receiver of a closed bank allowed claims of depositors and certified that fact to the Commission. The State Examiner was the only official recognized in the law as having authority to determine the net amount of the claim of a depositor in a closed bank, not against the bank itself, or its receiver, it must be noted, but against the Depositors Guaranty Fund. Although the claim might be valid in toto against the bank, it might be wholly invalid as a claim against the Guaranty Fund. From the determination of the State Examiner as to the amount of the deposit guaranteed and the offset, if any, the law of 1917 did not expressly provide an appeal.

It should also be noted that this suit is not against the State Examiner, as such, for the purpose of compelling him to act, or to perform a ministerial duty; it is against the Guaranty Fund Commission of which the State Examiner and the Governor were ex-officio members, under the law of 1917, but of which the former has not been a member since the law of 1923 became effective. The purpose of the action is to compel immediate payment in full of plaintiff's claim out of the Guaranty Fund.

It is strongly urged that under the law of 1917 it was the mandatory duty of the Guaranty Fund Commission to pay all claims against the Fund immediately and in the order in which banks became insolvent and closed. Assuming that the law of 1917 contemplated that payment be made immediately and in the order in which the banks closed, was it competent for the legislature to amend this act, as it did in 1923, so as to measure plaintiff's rights as to time and order of payment and procedure in acting on his claim by the new act, which unquestionably gives the Commission wide discretion in these respects?

The important and necessary place of banking in the present economic and industrial system, its close relation to the general welfare and the public interest, and the universal calamity that would result with its general collapse, have led the legislature to enact statutes of a regulatory and restrictive nature, but deemed necessary in the interest of public safety. It was settled early in the history of this state that the legislature could permit it to be conducted upon such conditions and subject to such regulations as it saw fit to prescribe, or even "forbid it altogether." In State ex rel. Goodsill v. Woodmansee, 1 N. D. 246, 11 L.R.A. 420, 46 N. W. 970, this court sustained the validity of the original act providing for the organization and government of state banks, saying, among other things, at page 250, in the official report: "But, as a matter of precedent and authority, the legislative prerogative, in the exercise of its police power in promoting the public safety, not only to regulate and restrict the business of banking, but also to grant the right to one class, and to prohibit to others, *or even to forbid it altogether,* has never been questioned in the courts, and the legislatures of other states have frequently exercised the right of supreme control over the business." The public interest involved is sufficient to warrant the State in exercising control over the banking

business, and, as said by our own court in the case cited, to prohibit the business of banking entirely, except upon such conditions as it may prescribe. See also Weed v. Bergh, 141 Wis. 569, 25 L.R.A.(N.S.) 1217, 124 N. W. 664; Schaake v. Dolley, 85 Kan. 598, 37 L.R.A. (N.S.) 877, 118 Pac. 80, Ann. Cas. 1913A, 254. Our State has established a thoroughgoing system of regulation and inspection of banks, charging the cost thereof against the banks; in 1917, the legislature enacted chapter 126 of the Session Laws of 1917, known as the Depositors Guaranty Fund Law. The direct purpose of this law is to insure the repayment of deposits made by individuals in banks chartered and from time to time inspected and examined by state authority. The constitutionality of a law of this general character was sustained, under the police power, by the Supreme Court of the United States in Noble State Bank v. Haskell, 219 U. S. 104, 55 L. ed. 112, 32 L.R.A.(N.S.) 1062, 31 Sup. Ct. Rep. 186, Ann. Cas. 1912A, 487, and has been many times upheld in the state courts. All regulations, like inspections, periodical examinations and reports that are required from the banks from time to time, are in the interest of public safety. They are not passed solely out of regard for the financial interest of stockholders or of depositors in banks; they rest upon the broader base that the public welfare and the stability of public business and commercial relations depend, to a great extent, upon honesty and soundness in the banking business. A unit thereof, in the form of a single bank, cannot collapse with out a perceptibly detrimental effect upon the public interest.

The Guaranty Fund Law has a more direct relation to the interests of depositors in banks than the general statutes regulating the business of banking and providing for the examination of state banks. It compels co-operation by banks in advance in order to insure the safety of deposits of money. This act deals specifically with the interests of one class of the general public directly interested in sound banking methods, namely, depositors; other regulatory laws, like those requiring examinations and reports, while they operate in the interest of depositors, are primarily a recognition of the fact that the general public is vitally interested in sound and honest banking methods. Whether the law be passed in the express interest of a designated portion of the general public, or of the public as a whole, the act must be classed as a regulatory measure and find its justification in the police power. It is a

legislative recognition of the law that confidence is the basis of credit; that when confidence takes wings, the structure of credit collapses.

It is evident that extensive bank failures were not anticipated by the legislature of 1917, which enacted the original Guaranty Fund Law. Section 15 of that act provided that when a bank within the act suspended or became insolvent, the State Examiner must determine "the pro rata amount due from each bank necessary to pay the unsecured depositors in full and cause the same to be certified to the Depositors Guaranty Fund;" this section then required the State Examiner at the same time to "certify to said Depositors Guaranty Fund Commission the amounts due to the several depositors of such insolvent bank and also, at the same time, certify any amounts that may be owing by said depositors to said bank." The treasurer of the commission "shall thereupon draw against the Depositors Guaranty Fund on deposit in the several banks in the amount thus certified, and shall *immediately* transmit to such depositors the amounts due them, less any amounts that may be owing by said depositors to such bank." If the fund on hand be inadequate to pay the claims, certificates of indebtedness were to be issued, negotiable in form, in favor of the bank and such certificates were to be paid out of the first money accruing to the Fund. Section 16 provided that the commission, for the use and benefit of the fund, should be subrogated to the rights of depositors paid and might participate in the assets of the insolvent bank; this right the State Examiner was required to enforce.

The legislature of 1923, when chapter 200 of the laws of that session was enacted, had before it a serious condition, caused by the closing of a large number of banks, the first of which went down in 1920, with large claims, actual and potential, against the Guaranty Fund. The situation, contrary to that which was before the legislature in 1917, clearly disclosed that it would be possible to pay immediately or within a reasonable time, from assessments levied against functioning banks, only a comparatively small number of the depositors in the banks then closed, without imposing burdens on open banks that would lead to general insolvency and collapse of the state banking system. Whether the power exist to impose such a burden, we need not decide. It was also evident from the extent of the liabilities of closed banks to depositors and consequent potential and probable liability of the Guaranty Fund

to such depositors, that if the depositors were paid in full by levying assessment to the maximum legally permissible, as well as practically possible, under the law, in the order in which banks closed, the result would be that depositors in banks which closed last, or even a few months after those which first suspended, could not be paid any portion of their claims for a long period. Consequently, and doubtless in the interest of justice, as it seemed to the legislature, the provision for payment to depositors under the law of 1917, as made in § 15 thereof, was fundamentally changed. It is provided in § 21, chapter 200, Session Laws 1923, that if the Guaranty Fund be insufficient to pay the claims of depositors duly allowed, the Commission may pro rate payments upon certificates of indebtedness from the fund on hand. That is, the legislature decided that instead of exhausting the Fund in paying depositors in banks that first closed and leaving others to wait for an indefinite period, it would be more just and equitable to provide that as many claimants as possible should receive a dividend upon their claims within a reasonable time.

In further contrast with the provisions of §§ 15 and 16, Act of 1917, supra, § 22 of the law of 1923 provides that to the extent of deposits allowed as guaranteed the Guaranty Fund Commission is subrogated to the rights of such depositors to participate in the assets of "such closed bank," and that such right shall be enforced by the Secretary of the Commission; that from time to time, as the assets are liquidated and cash realized thereon, the same shall be pro rated as a payment upon the certificates issued *"to the guaranteed depositors of the closed bank from which such payment had been received until full* payment is made to the holder of such certificate." The surplus remaining after payment to holders of certificates as aforesaid is turned into the Fund and becomes available for payment as a general dividend upon all outstanding certificates of indebtedness.

Some of the changes made by the act of 1923, not already indicated, so far as pertinent to any matter involved in this appeal, are as follows: The commission acts on all depositors' claims against the fund; under the old law, the State Examiner acted thereon; provision is made for a hearing on all claims disallowed; no such provision was made in the original act; it is expressly provided that the decision of the commission shall be final; the commission may pro rate payments from the

.fund·and may use the fund in giving temporary aid to open banks and
in·salvaging assets of closed banks, when so doing seems likely to bene-
fit the fund and depositors in closed banks; the original act was silent
or contained no express provisions on these points; whether the power
:could have been implied need not be decided.   The State Examiner is
no longer a member of the commission.   Other changes are referred to·
·in the course of the opinion.

.   It will be perceived that the legislature of 1923 undertook to change
substantially, not only the time and manner of paying the claims of
.depositors in .closed banks, but the relation of depositors to the Guar-
:anty Fund· and of the Guaranty Fund to the individual banks.   It,
therefore, becomes necessary to determine to what extent, if any, de-
positors in banks that had closed before the law of 1923 went into effect,
but whose claims had not been submitted to or acted on by the State
Examiner and by him certified to the commission, had acquired vested
rights or vested interests in the fund which at that time had been ac-
cumulated by the Commission pursuant to the law· of 1917.   Specifi-
cally, in the case at·bar, had the right of the plaintiff to participate in
the Guaranty Fund become a vested right or a·vested interest which
the legislature of 1923 could not disturb or substantially change?   If
his right or interest had become vested, it is contended that the legisla-
ture· of 1923· possessed no power either to take it from him, or to post-
pone materially his enjoyment of it, by giving the· commission discre-
tion as to the time and order of payment where, it is assumed, none
existed before.

The phrase "vested right" or "vested interest" has been frequently
defined by the courts.   It would serve no useful purpose to enter into
a lengthy discussion as to the meaning and proper application of the
phrase in every case that may arise.   There is a vested right in an ac-
crued cause of action; Sutherland, Stat. Constr. § 480; a vested right
of action is property in the same sense as tangible things are property
and is equally protected against arbitrary interference; Cooley, Const.
Lim. 5th ed. 445; a vested right is an *immediate fixed* right to *present
and future* enjoyment, or where the interest does not depend upon a
period or an event that is uncertain; the right is vested when the en-
joyment thereof has become the property of some person as a *present
interest;* the right is *expectant,* not vested, when it depends on the con-

*tinued existence* of the *present condition* of things until the happening of some future event; the right is contingent, not vested, when it comes into existence only on an event or condition which may not happen; Pearsall v. Great Northern R. Co. 161 U. S. 646, 40 L. ed. 838, 16 Sup. Ct. Rep. 705; *a right is not vested so long as something remains to be done to consummate it and to fix the right of the citizen to enjoy it; it seems to be a right or interest in property not open to doubt or controversy.* Moore v. State, 43 N. J. L. 203, 39 Am. Rep. 558; Evans-Snider Buel Co. v. McFadden, 58 L.R.A. 900, 44 C. C. A. 494, 105 Fed. 293; Downs v. Blount, 31 L.R.A. (N.S.) 1076, 95 C. C. A. 289, 170 Fed. 15, 20. A vested right is "an immediate right of present enjoyment, or a present fixed right of future enjoyment." 4 Kent, Com. 202.

In several of the adjudicated cases, the courts appear to define and apply the phrase "vested right" or "vested interest" not in a close, narrow, or technical sense, but rather as meaning a right or interest which in *equity* and *good conscience* the state should recognize and protect and of which the individual cannot be deprived arbitrarily without injustice. In Evans-Snider-Buel Co. v. McFadden, supra, in a carefully considered opinion, Justice Thayer says: "It may be difficult in some cases to fix the precise date at which a right can be said to be fully vested, and for that reason to have become property within the meaning of the Federal Constitution, when the right in question is *purely of statutory creation* or has been acquired by pursuing some remedy which the law affords to suitors, *and is in no sense an obligation arising out of contract. . . .* When called upon to solve questions like the one in hand, the courts have never deemed it necessary to close their eyes to the equity of the case, but have frequently permitted their judgments to be influenced by the consideration that *that which the legislature has done in the way of disturbing rights acquired under existing laws was morally right,* and in accordance with justice and fair dealing." See also Diamond State Iron Co. v. Husbands, 8 Del. Ch. 205, 68 Atl. 240. (Italics are ours).

We think plaintiff's claim was, at most, an imperfect, inchoate degree of property and not a vested right or interest. See 2 Bl. Com. p. 442; Coles v. Madison, Breese (Ill.) 115, 12 Am. Dec. 165. A cause of action in his favor and against the commission had not come into exist-

ence when the new law went into effect for the reason that the Bank Examiner had certified nothing pertaining thereto to the commission, as required by the old law. If the plaintiff acquired a vested right in that portion of the Guaranty Fund which had been collected at the time the bank closed merely because he was a depositor therein, then all depositors in banks that closed before the law of 1923 went into effect acquired a similar vested right to payment in full from that part of the fund which had been accumulated through assessments made prior to July 1, 1923, in the order in which the banks closed. If that were the correct construction of the statute, it would operate to deprive the overwhelming majority of the depositors in closed banks of any payment whatever on their claims from the existing, altogether inadequate Guaranty Fund. Payment as to them would necessarily be postponed to such remote period as would be required to replenish the fund. The result would be that a plan obviously devised to protect all depositors equally would, through judicial construction, be made to give full protection to some and practically no protection to others. The difficulties, complications and injustice that would arise from such a construction of the law would render its administration cumbersome and costly, would to a great extent defeat the legislative purpose common to the act of 1917 and to that of 1923. These considerations doubtless influenced the legislature to enact chapter 200, Session Laws 1923. Whether approval of a claim as guaranteed by the State Examiner would have created a vested right which the legislature could not have disturbed by subsequent legislation, is not decided. But see Louisiana ex rel. Folsom v. New Orleans, 109 U. S. 285, 27 L. ed. 936, 3 Sup. Ct. Rep. 211.

In determining the question whether any vested right of the plaintiff, or of others similarly situated, was violated by the law of 1923, regard must be had for the purpose the legislature had in view. It is a familiar rule that there is no vested right in wrong; with particular reference to the situation before us, it may likewise be said that there is no vested right in inequity. Considering, for the moment, that aspect of the legislative purpose which bore directly upon the interest of depositors in banks, as apart from the general public interest, that purpose could be fully accomplished under the law of 1917, operating under normal conditions as then known, understood and anticipated

by the legislature. Abnormal and unforeseen calamities overtook the banking business during the period intervening the enactment of the law of 1917 and that of 1923, apparently commencing in 1920, with the result that the legislative purpose, the same in each instance, both with respect to the public interest and the specific interest of individual depositors, could have been but very inadequately accomplished in the manner prescribed by the act of 1917, but could be, to a greater, and, in the judgment of the legislature, a more equitable extent, attained by the plan prescribed in the law of 1923. In the legislative judgment, the beneficent purpose of the law, from the general standpoint of the public interest, as well as from the viewpoint of individual depositors, would be better served by providing an equitable, pro rata distribution of the Guaranty Fund among a large number of depositors than by paying all the depositors in one, two or three banks, while leaving the depositors in eighty or a hundred banks to wait indefinitely for payment from the guaranty fund. We think that the general statement of the rule in 2 Story, Const. 5th ed. 674, applies to the situation presented in the record. "A party has no vested right in a rule of law which would give him an *inequitable advantage over another;* and such rule may, therefore, be repealed and the advantage thereby taken away." (Italics are ours.) The assessment, creation, and administration of the fund, from whatever standpoint considered, are made pursuant to a legislative policy, which may be changed at will; the payment of the assessment is compulsory, (failure to pay it is followed by results substantially identical with those that follow when special assessments against property are not paid, the property—here the right to do a banking business—may be taken) does not rest upon contract in any respect, and the legislative wisdom which dictated the adoption of that policy may likewise alter or abandon it. We are, therefore, of the opinion that the depositors in closed banks, who had taken no steps to have their claims determined, liquidated, and allowed in the manner provided by the act of 1917, or concerning which facts had not been certified to the Commission, as provided in that law, prior to July 1, 1923, had no such vested right or interest in the continuance of the plan of payment from the Guaranty Fund provided in that act as to render it incompetent for the legislature to change this plan in 1923 so as to provide for the paying of dividends upon a large number of

claims, according to the sound discretion of the commission, rather than to pay the depositors in one or two banks in full, while leaving all others to wait indefinitely.

The State undertakes to perform a service to depositors not in any manner founded on contract; that service and the compensation provided in the act are somewhat analogous to the situation presented in the pension cases. It is held that the pension is a bounty, and that the beneficiary, even though the municipality may have deducted a part of his salary to create a pension fund, has no vested interest therein which may not be taken away by subsequent changes in the statutes. See Pecoy v. Chicago, 265 Ill. 78, 106 N. E. 435; Pennie v. Reis, 132 U. S. 464, 33 L. ed. 426, 10 Sup. Ct. Rep. 149; Friel v. McAdoo, 101 App. Div. 155, 91 N. Y. Supp. 454; Head v. Jacobs, 150 Ky. 290, 150 S. W. 349; Gibbs v. Minneapolis, 125 Minn. 174, 145 N. W. 1075, Ann. Cas. 1915C, 749; Eddy v. Morgan, 216 Ill. 437, 75 N. E. 174.

The question as to the suability of the Guaranty Fund Commission is not free from difficulty. The State, through the agency of the Commission, undertakes to render a service, it is true, to a class of citizens, namely the depositors in closed banks, but the broad basis upon which the exercise of the power rests is the safety and welfare of the State and of its citizens as a whole, rather than the interest of the individuals who make deposits in banks. In executing this purpose in the interest of the public safety, the State is acting in a governmental capacity; it necessarily must create a suitable agency through which to act and such agency is the Guaranty Fund Commission. It is but an arm or a branch of the executive department of the State in executing a specific legislative policy, and is not suable without the consent of the State. In performing their duties under this act, the Commission act as executive officers, administering a fund in which the State has at least a possessory interest in order to carry out the purpose of the law. Lankford v. Platte Iron Works Co. 235 U. S. 461, 59 L. ed. 316, 35 Sup. Ct. Rep. 173. See also Miller Supply Co. v. State Bd. of Control, 72 W. Va. 524, 78 S. E. 672; State ex rel. Louisiana Trust & Sav. Bank v. Board of Liquidation, 136 La. 571, 67 So. 370.

The State of Oklahoma enacted a Depositors Guaranty Fund Law many years ago very similar to the Depositors Guaranty Fund Law enacted by the legislature of North Dakota in 1917. In Lovett v.

Lankford, 47 Okla. 12, 145 Pac. 767, the Supreme Court of Oklahoma held that the Guaranty Fund was a state fund, created in the exercise of the power invoked when taxes are levied for the support of the common schools, that such fund was a state or public fund, and concluded that the State Banking Board was not subject to suit by a depositor asserting a claim against the fund for the reason that such a suit would, in fact, be a suit against the State. The members of the Oklahoma Banking Board, other than the State Examiner, are appointed by the Governor. This construction of the Oklahoma Act was sustained by the Supreme Court of the United States in Lankford v. Platte, Iron Works, 235 U. S. 461, 59 L. ed. 316, 35 Sup. Ct. Rep. 173. The Oklahoma Court, in Lovett v. Lankford, supra, says, among other things: "In considering §§ 300 and 303 together, it will be seen that the law has specifically confided to the Banking Board and the Bank Commissioner the duty and authority to determine the validity of claims against the Depositors Guaranty Fund. By this section it is not only their duty to determine when a claim is valid against the bank, but they must further determine whether such claim is protected and required to be paid from the Depositors Guaranty Fund. Lankford v. Oklahoma Engraving & Printing Co. 35 Okla. 404, 130 Pac. 278." The court further says: "Defendants in error (The Banking Board) constitute a part of the executive department of the State. They are required to pass upon the validity of the claim in question, and as to whether it was protected by § 303, supra, and was entitled to be paid out of the Depositors Guaranty Fund. It was their duty to construe the law and apply it to the facts before them. . . . . From the foregoing it is clear that defendants constitute a part of the executive department of the state government and that they were vested with the exercise of discretion and judgment in the premises; and their action cannot be reviewed or reversed in a proceeding for a writ of mandamus."

It is sought to distinguish the Oklahoma holdings on the ground that the State Examiner is a constitutional officer in that state. He is enumerated with other officers in the Constitution as a repository of executive power. The authority, however, which he exercises is conferred upon him by statute *and he is made a member of the Banking Board by statute in that state.* Section 71 of the North Dakota Con-

stitution vests the executive power of the State in the Governor. It is his duty, as a repository of the supreme executive power, to supervise the enforcement and administration of laws enacted for the purpose of putting into execution legislative policies. The Governor is an ex-officio member of the Guaranty Fund Commission, of the State Banking Board, and, of course, of other boards. The Constitution of the State of Oklahoma vests the general executive authority of the state in the Governor and other enumerated officials, including the State Examiner and, by implication, the Bank Commissioner. Section 1, art. 6 and § 1, art. 14. The Bank Commissioner in Oklahoma, like the State Examiner in North Dakota, is appointed by the Governor. In both states, the power or authority that carries out legislative policy expressed in statutes, like the Guaranty Fund Act, is, in general, of an executive nature.

The reference to the fact that the examiner is a constitutional officer in Oklahoma, made in the case of State ex rel. Taylor v. Cockrell, 27 Okla. 630, 112 Pac. 1000, is not made for the purpose of attributing to him any different or greater authority because of that fact, but in order to answer the question before the court in that case as to whether the examiner had the right to examine books and accounts of the Bank Commissioner, who, under certain statutes, was, at that time, charged with the duty of administering the affairs of insolvent banks. It is difficult to perceive any distinction in principle that can be rested upon the proposition that the office of State Examiner in North Dakota is created by statute, while in Oklahoma it is created by the Constitution, when in both states the duties and powers of the Examiner are prescribed by statute. In North Dakota, the Governor, a constitutional officer, is a member of the Commission. Our conclusion is that there is no distinction in principle and that the Oklahoma decisions are in point, unless the Guaranty Law of Oklahoma is substantially different from the North Dakota Act of 1917. It is not necessary to review the Oklahoma law at length. We have examined that act and there is no substantial difference requiring a different conclusion.

In referring to the Oklahoma decisions, it was suggested by counsel for one of the parties that the Oklahoma Court, in arriving at the conclusion that the Guaranty Fund was in effect a state fund, was not embarrassed by a constitutional provision similar to section 186 of our

Constitution, which provides that "no money shall be paid out of the state treasury except upon appropriation by law. . . ." Section 55 of article 5 of the Oklahoma Constitution provides: "No money shall ever be paid out of the treasury of this state, nor any of its funds, nor any of the funds *under its management,* except in pursuance of an appropriation by law . . . ." It will be noticed that the North Dakota constitutional provision is not so comprehensive as that of Oklahoma. The Oklahoma Court in State ex rel. Taylor v. Cockrell, supra, held that the Guaranty Fund was "under the management of the state" in any event, even if it was not a state fund. Notwithstanding the constitutional provision adverted to, the Oklahoma Court, in cases decided subsequent to State ex rel. Taylor v. Cockrell, supra, had no difficulty in arriving at the conclusion that the Depositors Guaranty Fund was a state fund, and that disbursements therefrom might, notwithstanding, be made without the formality of a legislative appropriation.

On the question of the suability of the Guaranty Fund Commission, reference is made in briefs of counsel for the appellant to some North Dakota decisions in support of the contention that the Guaranty Fund is not a public fund. The first case cited is State ex rel. Olson v. Jorgenson, 29 N. D. 173, 150 N. W. 565, where the State Hail Insurance Law and the fund created thereby, chapter 23, Session Laws 1911, was under consideration. The fund collected under that act consisted of *voluntary payments* or contributions by individuals who desired to participate in the supposed benefits of the law. The State was merely the custodian of a fund *voluntarily contributed* for the sole benefit of the contributors themselves. Of course no appropriation was necessary to authorize disbursements therefrom. It was very properly held that it was not a state fund, or public fund, or "money" within the contemplation of § 186 of the state Constitution. State ex rel. Linde v. Taylor, 33 N. D. 76, p. 109, L.R.A.1918B, 156, 156 N. W. 561, Ann. Cas. 1918A, 583, is likewise cited. That case affirms the rule laid down in State ex rel. Olson v. Jorgenson, supra, with respect to the characteristics of a public fund and holds that the language in that case is applicable to the State Bonding Fund and that the Bonding Fund was not a public fund within the contemplation of § 186 of the Constitution so as to require a legislative appropriation before disbursements could legally be made therefrom. State ex rel. Stearns v. Olson, 43 N. D.

51 N. D.—40.

619, 175 N. W. 714, also cited by counsel, is a case in which the question was involved as to the right or duty of the state auditor to audit claims against the Workmen's Compensation Fund. It was there held that the Workmen's Compensation Fund was not a public fund or "money" within the meaning of section 186 of the Constitution, so as to require legislative appropriation before the same could be legally paid to claimants.

There is nothing in any of these decisions in any way inconsistent with the conclusions we have reached in the instant case. With reference to the Workmen's Compensation Fund the statute expressly authorized suits to be brought against the officers charged with the duty of administering the law. Under the original Hail Insurance Act of 1911, involved in the case of State ex rel. Olson v. Jorgenson, supra, while no provision was made for suit against the Insurance Commissioner, provision was made for arbitration in case of dispute and the decision of the arbitrators was declared to be final. In the case at bar, the fund is collectible by the compulsory process of the State and if the bank does not pay the assessment made, the valuable property right, given when the charter is granted, to do a banking business may be taken away. The fund remains on deposit in banks throughout the State; it is retained by the contributing banks until withdrawn by the Commission for use pursuant to the act. The law, in effect, designates each contributing bank a special depository of the assessment made against and due from it. Sess. Laws 1923, § 10, chap. 200. It is not necessary to determine who has legal title to the fund. The State of North Dakota, in any event, has a possessory interest therein which can be vindicated against all the world, except such as have acquired a vested right or interest in the fund. That fund is under the law used by the State in performing governmental functions for the protection, the safety, and welfare of its citizens. It does not necessarily follow that the fund is "money," within the meaning of that section, so as to require a prior legislative appropriation, as contemplated by section 186 of the Constitution, to authorize disbursements from it. The assessment or contribution is appropriated to the purposes of the statute at the moment the levy has been legally made. *It never reaches the state treasury.* The fund is under the control of the contributors, subject to draft by the commission, but at all times outside the treasury of

the State. This view is in no wise affected by the fact that the State Treasurer is ex-officio treasurer of the Commission. Payments from the fund are not payments "out of the State Treasury" within the meaning of the constitutional provision. See People ex rel. Einsfeld v. Murray, 149 N. Y. 367, 33 L.R.A. 344, 348, 44 N. E. 146.

The assessment to create the fund is somewhat analogous to a special assessment and must be referred to the sovereign power to levy a tax. See Noble State Bank v. Haskell, 219 U. S. 104, 55 L. ed. 112, 32 L.R.A.(N.S.) 1062, 31 Sup. Ct. Rep. 186, Ann. Cas. 1912A, 487, and Rolph v. Fargo, 7 N. D. 640, 652, 42 L.R.A. 646, 76 N. W. 242. It is not a license fee that must be paid as a prerequisite to engaging in business, or that is exacted for the purpose of raising a fund to be expended in regulating a business. It is levied for a public purpose in execution of a design proper and justifiable under the police power. It seems to the writer that the exaction from the banks, made in order to create the Guaranty Fund, is a species of taxation that rests upon the same general principles as special assessments; that the justice of imposing this special burden upon individual banks must be vindicated upon the assumption—underlying special assessments generally—that the contributors, while bearing the cost of a scheme which operates to the advantage of the public at large, will suffer no material loss because of the increased public confidence and security and the consequential increase in revenue-producing business. See State, New Jersey R. & Transp. Co., Prosecutors, v. Newark, 27 N. J. L. 190; Ellison v. LaMoure, 30 N. D. 43, 151 N. W. 988; Rolph v. Fargo, 7 N. D. 640, 42 L.R.A. 646, 76 N. W. 242.

The fund, thus created, is a public fund, created through the exercise of the taxing power, for a public or governmental purpose, and to be controlled by a state agency in the public interest. Under the facts this view is consistent with the holding that it is not "money" within § 186 of the Constitution. See People ex rel. Einsfeld v. Murray, supra.

There is no conflict between the suggestion that the assessment is analogous to a special assessment and the levy thereof is, to that extent, an exercise of the power to tax, and our conclusion that the Guaranty Fund Law is a regulatory measure enacted under the police power. The legislative policy to assess the cost of public improvements against

the property benefited thereby finds sanction in the police power; while the levy of assessments to pay the cost thereof against property benefited is an exercise of the sovereign power to levy a tax. See Rolph v. Fargo, supra. It is elementary that the sovereign, in executing a policy adopted under the police power, may find it necessary to exercise the power of taxation. There is, in legal theory, no inconsistency or conflict in the exercise of these powers in the execution of the same governmental design.

Having held that the Commission is not subject to suit without the consent of the State, we must next ascertain if there is authority to maintain this action in the constitution or the general statutes on the subject.

Section 22 of the Constitution of North Dakota provides that:

"All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay. Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct."

The right to maintain a suit against the State, therefore, exists only as provided by statute. No provision is made, either in the Law of 1917 or that of 1923, for suits against the Guaranty Fund Commission or against the State upon any matters arising out of the administration of the law.

Section 8175, Comp. Laws 1913, reads as follows:

"An action respecting the title of property or arising upon contract may be brought in the district court against the state the same as against a private person. When such actions are not of a local nature, they shall be brought in the County of Burleigh. . . ."

In the enactment of this statute, the legislative policy with respect to the protection of rights when infringed by the State is clearly expressed. It seems to have been the intention to make no distinction with respect to the right of an individual in so far as the remedy was concerned to redress wrongs or to enforce his right "arising upon contract" merely because the adversary was the state. Under the facts in the pleadings and the Depositors Guaranty Fund Law, is the relation between the state and depositors in closed banks in any sense one of con-

tract, express or implied? We do not think so. We have seen that the fund is to be used for a purpose proper under the police power; and that it is created through the exercise of the power of taxation. See Noble State Bank v. Haskell, supra, Lovett v. Lankford, 47 Okla. 12, 145 Pac. 767, and Lankford v. Platte Iron Works Co. 235 U. S. 461, 59 L. ed. 316, 35 Sup. Ct. Rep. 173. The end in view is governmental in character; the means which the legislature deemed best calculated to attain that end require the exercise of sovereign powers. The essential elements of the causes comprehended in the class familiarly known in the law as actions ex contractu are wholly lacking.

A word may be added with respect to the practical consequences of a holding that the commission is subject to suit. As observed by the Supreme Court of the United States in Lankford v. Platte Iron Works Co. supra, the scheme of the act "may be embarrassed if not defeated by subjecting the banking board to incessant judicial inquiries as to its administration." The record gives a hint of what may develop. Some twenty lawsuits are already pending; others may be, doubtless are, brewing; thousands of claimants—potential litigants—are involved. The time and funds of the commission would be consumed in litigation. Doubtless this powerful consideration influenced the legislature in giving ample opportunity for hearing before the commission, but without appeal from its decisions. In government and public administration, someone must be entrusted with power of final decision. Under the facts here, the commission may make final decisions without encroaching on the judicial function. See Luther v. Borden, 7 How. 1, 12 L. ed. 581; Den ex dem. Murray v. Hoboken Land & Improv. Co. 18 How. 272, 15 L. ed. 372. The presumption is that these officials, like judicial and other officers, will do their duty faithfully, impartially and honestly.

Nothing that has been said can be construed as a holding that a depositor may not in a proper case proceed against the Guaranty Fund Commission or its officers. It is not intended to be held that a depositor or other person may under no circumstances maintain an action in the proper forum, having for its object to require the Guaranty Fund Commission or its officers to perform an official or legal duty not of a governmental character, owing to a class of persons of whom such depositor or person is a member. While the rule is that a suit cannot be

maintained against the sovereign without its consent, it is equally well established that a clear official duty, not involving the exercise of discretion, may be enforced when performance thereof is arbitrarily refused; and that if a person will receive injury because an official is about to violate an official or legal duty, for which adequate compensation cannot be had at law, such conduct may be enjoined. Board of Liquidation v. McComb, 92 U. S. 531, 23 L. ed. 623. To state the matter somewhat differently, if the plaintiff in the instant case simply occupied the position of a creditor demanding payment of a liquidated claim against the state from an administrative or executive officer charged with the ministerial duty of paying him the money, and that the defendants arbitrarily refused to make such payment, it is not intended to be held that the plaintiff might not compel performance of such duty in a proper proceeding. See State ex rel. Stearns v. Olson, 43 N. D. 619, 175 N. W. 714. See also Cunningham Case, 109 U. S. 452, 27 L. ed. 994, 3 Sup. Ct. Rep. 292, 609 ; Rolston v. Missouri Fund Comrs. (Rolston v. Crittenden) 120 U. S. 390, 412, 30 L. ed. 721, 728, 7 Sup. Ct. Rep. 599. The proceeding suggested would aid in furthering the legislative purpose by compelling the performance of a duty enjoined upon public officials by legislative enactment in cases where legal rights were infringed in excess of official authority or in disregard of legal duty. It is not necessary at this time to decide or to discuss further under what circumstances such an action may be maintained.

It seems plain that if the plaintiff and other persons similarly situated can control the action of the defendants in a suit at law or in equity, in acting on their claims in the absence of fraud, or arbitrary action or nonaction contrary to statute, that the decree entered would affect the State in its sovereign capacity, and more or less directly interfere with it in the performance of governmental functions. The entire act is grounded, as we have held, upon the proposition that the public safety and the general welfare will be subserved by the administration of its provisions; a part of the act provides for the compulsory payment, the collection and disbursement of a fund in execution of the general design; to direct the time, the manner or the method of disbursing such fund would be an interference by the courts with the exercise of governmental functions and a judicial administration of a law en-

acted pursuant to the police power and in furtherance of the public interest, the public safety, and the public welfare. We do not believe that it was the intention of the legislature or of the constitution that the courts should have any such power unless expressly authorized by the statute under consideration in a given case.

In order to guard against a misconception or misunderstanding as to the legal effect of our conclusions, it should be reiterated that the Guaranty Fund Commission is not, by this decision, put beyond or above the law and the constitution. The rights of the citizen to due process, to the maintenance of the legal sanctity of the obligation of a contract, to the equal protection of the law, and to the enjoyment of the rights guaranteed by the constitution of the state and of the nation, will be open to vindication and their violation to redress against the commission, no less than against any person, natural or artificial. Neither the Guaranty Fund Commission nor any officer may, under our legal system, set the Constitution at defiance; officers and private individuals alike must obey it and respect the rights of persons thereunder. No such rights are in jeopardy in the case at bar and if any such rights be endangered by the Commission in the future, no injured person will be denied the redress or the remedies to which he is entitled under the fundamental law of the land.

What has been said applies with equal force to the complaint in intervention. For the reasons heretofore stated, that complaint likewise fails to state a cause of action.

The question of the right of the Guaranty Fund Commission, or of any state officer, to temporarily use the fund to assist open banks or salvage the assets of closed banks for the benefit of the guaranty fund, is in no manner involved or decided. An expression of opinion thereon would be obiter and purely gratuitous.

The order of the trial court sustaining the demurrer to the complaint and overruling the demurrer to the answer is affirmed.

BIRDZELL, NUESSLE, and CHRISTIANSON, JJ., concur.

BRONSON, Ch. J. (dissenting). I dissent. It will serve no useful purpose to consider in detail the long opinion rendered by a majority of the Court in this cause. In my opinion the complaint states a cause

of action. I deny that the Guaranty Fund, as established by the legis-lature in 1917, is a mere misnomer and can be changed as to its pur-poses and its devotion ad libitum. This is a cause in equity. The State Examiner is a party. The action is based upon the right of a depositor in the Guaranty Fund established under the old law. Here the major question is not involved of the priority of one depositor or of his right to participate as against another depositor under the old Guar-anty Fund law, but the question is presented of the right of any de-positor who has a right to participate under the old Guaranty Fund law, or of preserving his right or receiving anything at all for his de-posit in an insolvent bank pursuant to the terms of the old Guaranty law. I am not concerned with the arguments in the majority opinion that serve to justify the enactment of the new law. In my opinion it is wholly unnecessary in this action in equity to erect line fences upon purely technical grounds to justify the application of the new law and the obliteration of the manifest intent and purposes of the old law. The majority opinion draws a shadowy line between an imperfect, in-choate degree of property and a vested right. I am satisfied that the complaint is sufficient under liberal rules of construction to show an accrued right, indeed, a vested right, if highly technical distinctions are to be drawn. If plaintiff's claim must be termed an imperfect, in-choate degree of property, the degree results not from plaintiff's acts but from the failure of state officials to follow the law. Under fair rules of construction applied to the allegations of the complaint, such as should be applied in cases of a demurrer thereto, considered in con-nection with the law applicable to such allegations, plaintiff's claim may have received every act of approval requisite for its payment out of the old Guaranty Fund. Unquestionably plaintiff had a deposit in this insolvent bank. He duly presented his claim to the receiver. By him it was duly allowed. This claim so allowed was certified to the Guaranty Fund Commission. Pray, who alone could certify? The receiver may have been appointed by the State Examiner; he may have been acting under the direction and supervision of the State Examiner. Laws 1915, chap. 53; Laws 1917, chap. 126. Under the law the State Examiner was authorized to take possession of this insolvent bank and to do all things necessary to conserve its assets and business and to pro-ceed to liquidate its affairs. His receiver was required to report to him

and to act under him.   Laws 1915, chap. 53.   The receiver in charge may have been in fact and in law the State Examiner.

The old Guaranty Law pretended at least to give some assurance to depositors, who had become such in reliance upon this law, that to the extent that the Guaranty Fund was constituted, some protection to them would be afforded when a bank in which they had deposits became insolvent.   It imposed upon State Officers certain duties to be performed to the end that this protection might be carried into effect.   The duties of allowance and certification were not imposed upon the depositor. Perchance, plaintiff presented his claim precisely as the State Examiner and the Guaranty Fund Commission, in their routine provisions, had directed and provided.   Ought it now to be said and held in this, an equitable action, that plaintiff should lose this protection and his right because State Officers who are defendants in this action have failed in their duty?   In considering this question no smoke screen can be spread as an answer to the effect that to accord this protection and preserve plaintiff's right, the new Guaranty law must be held to be unconstitutional.   Such an answer is a non sequitur.   The new Guaranty Law might be considered constitutional, and, nevertheless, the protection assured plaintiff and his right preserved.   The question involves an assured protection and a right accrued in plaintiff's favor.

In my opinion the state chargeable as a trustee of the old Guaranty Fund to whatever extent plaintiff may establish his right under the allegations of his complaint.   In this proceeding I am not concerned, so far as plaintiff's right is concerned, with the powers and duties, or even concerning the suability, of the Guaranty Fund Commission under the new law.   The point is that depositors in closed and insolvent banks, whose right under the old Guaranty law had accrued before the enactment of a new Guaranty law, possess the right to charge the state as trustee of the fund established and constituted so for their benefit; and to maintain an action against officers of the state charged with its administration to enforce their rights.

I deny that the state, or any of its officers, with respect to plaintiff's accrued right, may take this trust fund from John Jones or Henry Smith and hold it for some different Jones or Smith who may, some time in years to come, perhaps, be a depositor in another insolvent bank; or likewise, that this trust fund, under the old Guaranty Fund

law, so far as it must be devoted to the right of Smith on Jones, can be taken by a state officer and used for the purpose of rehabilitating or financing various or any going banks in this state.