John EBACH and Joyce Ebach,
Plaintiffs and Appellants,

v.

Robert R. RALSTON, Defendant,

and

The City of Minot, a municipal corpora-
tion, Defendant and Appellee.

Civ. No. 900365.

Supreme Court of North Dakota.

May 7, 1991.

Timothy J. Austin of Kelsch, Kelsch, Ruff & Austin, Mandan, for plaintiffs and appellants.

Cheryl L. Anderson of Gunhus, Grinnell, Klinger, Swenson & Guy, Moorhead, Minn., for defendant and appellee.

LEVINE, Justice.

John Ebach and Joyce Ebach appeal from summary judgment in favor of the city of Minot. We affirm.

John Ebach was injured in December 1984 when a truck ran a stoplight and struck Ebach's car in the intersection of

the highway 2–52 bypass and 16th Street Southwest in Minot. The bypass is a part of the state highway system. In the 1970s, the state department of transportation (department)[1] initiated traffic volume studies and redesigned the traffic control measures used at this intersection.

Initially, the bypass was designated a through street and access from 16th Street was controlled with stop signs. In 1979, the department approved, and the City installed, an interim traffic signal light that operated on a timed basis. The City asked the department to make the change from stop sign to signal light at the request of a property owner located south of the bypass. The City and the department signed the first of three cooperative agreements covering the signal light in which the City agreed to do routine maintenance and the department retained the right of prior approval for major maintenance or alterations of the light or its operation.

From 1980 until 1984, the department continued to study traffic patterns at the intersection; the City lobbied the department to upgrade the traffic signals. In 1982, the department and the City signed a second agreement to operate the signal light as a semi-actuated traffic signal. In the fall of 1984, the department and City signed a third agreement to install and operate a fully actuated traffic signal. John Ebach was injured in December 1984.

The Ebachs brought an action against the driver of the truck and the city of Minot. Ebachs alleged, among other things, that the City had negligently used a signal light at the intersection. The City denied all liability and moved for summary judgment, claiming that the department had sole and exclusive jurisdiction over the intersection. The district court concluded that the City had no control over the inter-section and granted summary judgment in favor of the City.

Ebachs appealed, claiming that North Dakota statutes give the City control over this intersection of a state highway and a city street, or in the alternative, that the City assumed control in this case.[2]

■■■ Summary judgment allows the disposal of a controversy if either party is entitled to judgment as a matter of law or if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts. *Federal Land Bank v. Anderson*, 401 N.W.2d 709, 711 (N.D.1987). Summary judgment is also appropriate where resolving disputed facts will not alter the result. *Umpleby v. State*, 347 N.W.2d 156, 159 (N.D.1984).

■■■ The determinative issue in Ebachs' claim against the City is whether the City controlled the choice of the signal light over other modes of traffic control. Ebachs argue that the use of a signal light rather than a stop sign on 16th Street was negligent. One of the elements of the tort of negligence is a duty on the part of the allegedly negligent actor to protect the plaintiff from injury. *Production Credit Ass'n v. Ista*, 451 N.W.2d 118, 125 (N.D. 1990). Whether a duty exists is generally a preliminary question of law for the court. *Id.* If the City had no control over the choice of the signal light, it could have no duty to John to control or abandon this signal light and summary judgment on the issue of negligence would be proper.

■■■ Ebachs first argue that our statutes give the director and the City shared jurisdiction over the intersection of state highway and city street. Our duty in interpreting statutes is to fulfill the object and intent of the legislature. *E.g., Aanenson v. Bastien*, 438 N.W.2d 151, 153 (N.D.1989). Several rules of construction guide our in-

---

**1.** At the relevant times, the City dealt with the highway department and highway commissioners. Pursuant to section 7 of chapter 72, S.L. 1989, effective January 1, 1990, references to the department of transportation and the director of the department of transportation have replaced references to highway department and highway commissioner in the Century Code. We will use the current titles in this opinion.

**2.** Ebachs' claim against the truck driver was not disposed of on summary judgment. The district court, however, under Rule 54(b) NDRCivP, certified that there was no just reason for delay and directed entry of final judgment dismissing Ebachs' claim against the City.

quiry into legislative intent. Statutes must be construed as a whole to determine the intent of the legislature, deriving that intent by taking and comparing every section and subsection as a part of a whole. *E.g.,* *State v. Mees,* 272 N.W.2d 61, 64 (N.D. 1978); *see* NDCC § 1–02–38(2) [entire statute intended to be effective]. We interpret statutes in context, *e.g., Stutsman County v. State Historical Soc.,* 371 N.W.2d 321, 325 (N.D.1985), and, in particular, read a statute in relation to others on the same subject in order to give meaning to each statute without rendering one or the other useless. *Mees,* 272 N.W.2d at 64. Our goal is to harmonize statutes and to avoid conflicts. *E.g., In re B.L.,* 301 N.W.2d 387, 390 (N.D.1981).

■■■■ Cities are creatures of statute and possess only those powers and authorities granted by statute or necessarily implied from an express statutory grant. *See, e.g., Munch v. City of Mott,* 311 N.W.2d 17, 20 (N.D.1981); *Fargo v. Cass County,* 286 N.W.2d 494, 500 (N.D.1979). In defining municipal powers, the rule of strict construction applies. *Haugland v. Bismarck,* 429 N.W.2d 449, 453 (N.D.1988). However, the manner and means of exercising those powers, unless prescribed by the legislature, are within the discretion of the City. *Id.*

The legislature has declared that an integrated system of public thoroughfares is essential to the general welfare of the state. NDCC § 24–01–01. To encourage an integrated system, the legislature has directed that the director of the department of transportation (director), county commissioners and local officials be provided with "sufficiently broad authority to enable [them] to function adequately and efficiently in all areas of appropriate jurisdiction ..." subject to limitations imposed by statute. *Id.* However, in discussing the jurisdiction of the director, county commissioners, and local officials, the legislature speaks in terms of the roads under the jurisdiction of each party, and encourages cooperation among the parties. *Id., see also* NDCC § 39–01–01.1 [declaration of intent concerning control of motor vehicles].

Our statutes give the director of transportation "complete authority to designate, locate, create, and determine what roads, highways, and streets shall constitute the state highway system...." NDCC § 24–01–02. The director is responsible for "the construction, maintenance, and operation of the state highway system...." NDCC § 24–01–03. *See also,* NDCC § 24–03–02 [director responsible for construction, maintenance, protection and control of state highways]. The director's authority is "subject however, to such conditions, [and] requirements ... as provided for by law." NDCC § 24–01–02. We, therefore, examine the statutes cited by Ebachs to determine whether they impose conditions on the director's authority that grant co-authority to cities.

Section 24–01–03, NDCC, specifically deals with jurisdiction and control of state highways located within cities, "urban connecting streets."

"Responsibility for state highway system.—The [director] shall be responsible for the construction, maintenance, and operation of the state highway system and he shall be authorized to enter into a cooperative agreement with any municipality for the construction, maintenance, or repair of any urban connecting street.

"The jurisdiction, control and duty of the state and municipality with respect to such urban connecting streets shall be as follows:

"1. The [director] shall have no authority to change or establish any grade of any such street without approval of the governing body of such municipality.

"2. The municipality shall at its own expense maintain all underground facilities in such streets, and shall have the right to construct such additional underground facilities as may be necessary in such streets.

"3. The municipality shall have the right to grant the privilege to open the surface of any such street, but all damage occasioned thereby shall promptly be repaired by said municipality at its

direction and without cost to the department.

"4. The municipality shall have exclusive right to grant franchises over, beneath and upon such streets."

Section 24–01–03, NDCC, is a special statute that deals with the subject of the distribution of control over state highways which pass through cities. The statute specifically allocates responsibility between the department and cities. It gives cities control over these urban connecting streets in only four instances: cities must approve any grade change proposed by the department; cities may maintain underground facilities in these streets; cities may grant the privilege to open the streets but have the duty to assure that prompt repairs are made when the streets are opened; and cities have the exclusive right to grant franchises which pass through the state highway right-of-way. Nowhere does this statute grant to cities control over traffic control devices used on state highways. And, in the face of this omission in a special statute which expressly allocates responsibility, we are hard-pressed to find an implied shared responsibility.

■ But, Ebachs say that sections 24–01–30, 24–01–31, 24–01–33, 24–01–34, NDCC, grant to cities authority over state highways. These statutes deal with "controlled-access facilities."[3] "The highway authorities of the state, counties, and municipalities of North Dakota, acting alone or in cooperation with each other ..." are authorized to establish controlled-access facilities. NDCC § 24–01–30. Within municipalities, this authority to establish controlled-access roadways is subject to "such municipal consent as may be provided by

law." *Id.* In addition to specific powers over controlled-access roads, the state, counties and municipalities are granted the power to use all general authority they have over roads "within their respective jurisdictions." *Id.*

Ebachs ask us to imply co-equal jurisdiction between the state and municipal authorities from this statutory authorization to work and to build these facilities together, and from the requirement of municipal consent when it is "provided by law." We decline. Instead, based upon the expansive authority over state highways given to the director in sections 24–01–02 and 24–01–03, and the clear references to the state and municipality's "respective jurisdictions" in the statutes cited by the Ebachs, we conclude that the state has sole authority to design and build state controlled-access highways except where statutes require municipal consent. The only municipal consent "provided by law" and identified by the Ebachs is found in section 24–01–03, NDCC. Subsection one of section 24–01–03 expressly requires municipal consent to any grade change. Municipal consent is implicitly required in subsection two which grants the City authority over facilities under the connecting street and in subsection four which grants the City authority over franchises which pass through the connecting street. These requirements for municipal consent, however, do not limit the director's authority to install a signal light. We conclude that sections 24–01–30, 24–01–31, 24–01–33, 24–01–34, NDCC, do not grant the City control over a traffic control signal located on a state highway.

■ Ebachs also argue that section 40–05–02(14), NDCC,[4] gives the City control

---

3. Section 24–01–01.1(9), NDCC, defines "Controlled-access facility" as:

 "... a highway or street especially designed for through traffic, and over, from, or to which owners or occupants of abutting land or other persons have no right or easement or only a controlled right or easement of access, light, air, or view by reason of the fact that their property abuts upon such controlled-access facility or for any other reason."

4. Section 40–05–02(14) provided at the time of Ebach's accident:

 "The city council in a city operating under the council form of government and the board of city commissioners in a city operating under the commission system of government, in addition to the powers possessed by all municipalities, shall have power:

 . . . . .

 "14. Traffic regulation. To regulate, control, or restrict within designated zones, or congested traffic districts, except that the speed limit for vehicles on those streets designated as part of any state highway shall be as determined by mutual agreement with the state

over this light. Section 40–05–02(14) authorizes a city to regulate by classes of traffic the use of public ways within the city. Ebachs contend that this section is a broad grant of municipal power over city streets limited only by the exception that the speed limit for streets that are part of any state highway must be determined by agreement with the director. Ebachs argue this broad power grants the City control over a stop light on a state highway. However, reading section 40–05–02(14) in conjunction with section 24–01–02, which gives the director complete authority to designate what roads compose the state highway, and section 24–01–03, which makes the director responsible for constructing the state highway system, we conclude that section 40–05–02(14) authorizes cities to regulate by classes of traffic the use of public ways within cities, including those city streets designated as state highways.

"Classes of traffic" is not defined in section 40–05–02, NDCC. However, section 39–01–01(79), NDCC, defines "traffic" as meaning "pedestrians, ridden or herded animals, vehicles, streetcars, and other conveyances either singly or together while using any highway for purpose of travel." We interpret section 40–05–02(14) as authorizing the City to regulate the use of state highways by people, animals and vehicles within cities, except that the setting of speed limits requires the consent of the director. A city's power does not, however, reach the design or the alteration of the roadway or the use of a traffic signal controlling the state highway, which are within the sole authority of the director. *See* NDCC §§ 24–01–02; 24–01–03.

 Ebachs also cite, as a source of city authority, several statutes which authorize cooperative agreements between the department and municipalities. They first argue that the mere fact such agreements are authorized evidences concurrent

jurisdiction between the department and municipalities.

The reason for cooperative agreements is given in section 24–01–01, the declaration of intent for establishing the state highway system. There, the legislature recognized that "an adequate and integrated system of roads and streets is essential to the general welfare of the state...." The legislature also recognized that the development of public thoroughfares requires broad authority on the part of the director, county commissioners, and local officials "with respect to the roads under their jurisdiction." *Id.*

"While it is necessary to fix responsibilities for the construction, maintenance, and operation of the several systems of highways, it is intended that the state of North Dakota shall have an integrated system of all roads and streets to provide safe and efficient highway transportation throughout the state. To this end, it is the intent of the legislative assembly to give broad authority and definite responsibility to the [director of the department of transportation] and to the boards of county commissioners so that working together, free from political pressure and local interests, they may provide for the state an integrated system of state and county highways built upon a basis of sound engineering with full regard to the interest and well-being of the state as a whole." *Id.*

We believe that the legislature has recognized that the state cannot build and maintain every public way and, thus, roads and streets will be built by all levels of government: state, county and local. Where these public ways meet, they must be integrated. Accordingly, the state and cities are authorized to plan road and street systems together, section 24–01–04, NDCC; the state, counties and cities are authorized to plan, finance and build controlled-access facilities, section 24–01–34; and the depart-

---

highway commissioner, the use of streets, alleys, or other public ways by various classes of traffic, except that any municipal regulations shall be ineffective as to common carriers licensed by this state under a certificate of public convenience and necessity until such

regulations are approved by the public service commission."

The requirement of Public Service Commission approval was removed from this statute by section 1, chapter 490, S.L.1987.

ment may contract with cities to build and maintain urban connecting streets, section 24–01–03, NDCC. Rather than creating concurrent jurisdiction among the state and the counties and cities, we read these sections as authorizing these governmental entities to negotiate the terms by which their respective areas of control will be integrated.

We do not, therefore, interpret these statutes authorizing cooperative agreements to bestow upon the City control over the signal light central to this case. Instead, based upon the broad authority given to the director under sections 24–01–02 and 24–01–03, NDCC, as well as the intent of the legislature in section 24–01–01, NDCC, and the authorization in section 24–01–03 allowing the director to contract with cities for the construction, maintenance and repair of connecting streets, we conclude that the director is authorized to delegate a portion of the department's exclusive jurisdiction and control through cooperative agreements.

The three cooperative agreements between the department and the City concerning the traffic signals require the department to furnish and install the signal lights and the City to provide routine maintenance of the signal light at the intersection of the 2–52 bypass and 16th street. They further provide that, "Any major maintenance or alterations from the ... plan will require Departmental approval prior to the work." We conclude that the agreement between the department and the City does not grant to the City the power to alter the signal light and the City cannot, therefore, be responsible as a result of this agreement for using a signal light rather than a stop sign.

The Ebachs argue that the City assumed a duty of care that makes it liable for negligence. In *Umpleby v. State*, 347 N.W.2d 156 (N.D.1984), we said that authority cannot be conferred upon public officials by consent or assumed voluntarily. 347 N.W.2d at 161. Umpleby was injured in a one-vehicle accident on a road located on property owned by the United States Army Corps of Engineers and licensed to the state department of game and fish. The road had been constructed by Morton County under an agreement with the corps and the game and fish department. Because such an agreement was not authorized by statute, we held that the county commissioners did not have authority to commit the county to the road work and the county had no duty to Umpleby. *Id.*

Ebachs argue this case is different from *Umpleby* because the City has statutory authority to control the light. Our preceding discussion establishes that there is no such authority. Accordingly, under *Umpleby*, the City could not voluntarily assume a duty of care towards John.

■ Finally, Ebachs claim that the trial court erred when it made certain findings of fact on summary judgment.[5]

These challenged findings relate to the propriety of selecting a fully actuated traffic signal device for a specific intersection. Because we have concluded that the City had no control over the signal light and, therefore, no duty of care, these facts are not material to the issue of the City's liability for negligence and any dispute over them would not prevent the district court from deciding the liability issue as a matter of law. It, therefore, was not error for the district court to make these findings in

---

5. The challenged findings are:

"V.

"The decision to upgrade the signals was made by the State of North Dakota on the basis of objective traffic engineering studies and qualified engineering judgment, as set forth in the Affidavit of Allan L. Covlin, Traffic Operations Engineer for the North Dakota State Highway Department."

"VII.

"The Manual of Uniform Traffic Control Devices provides that the decision to use a

particular device at a particular location *should* be made on the basis of an engineering study of the location and that traffic control signals *should* not be installed unless one or more of the signal warrants in the Manual are met. The Manual defines 'should' as 'an advisory condition, recommended but not mandatory.' The Manual also states that it is not a substitute for engineering judgment and that it is not intended as a legal requirement for installation of traffic control devices." (Emphasis in original.)

disposing of the City's motion for summary judgment.

Affirmed.

ERICKSTAD, C.J., and GIERKE, VANDE WALLE and MESCHKE, JJ., concur.