Judy Ann BULMAN, Plaintiff
and Appellant,

v.

HULSTRAND CONSTRUCTION CO., INC.; and the State of North Dakota, Defendants and Appellees,

and

Otto Moe and Robert Heim, individually and as partners doing business as Custom Tool & Repair Service, a/k/a CT & RS, and Custom Tool & Repair Service (CT & RS), Defendants.

Civ. No. 940047.

Supreme Court of North Dakota.

Sept. 13, 1994.

J.P. Dosland (argued), of Dosland, Nordhougen, Lillehaug, Johnson & Saande, Moorhead, MN., for plaintiff and appellant.

Steven A. Storslee (argued), of Fleck, Mather & Strutz, Bismarck, for defendant and appellee Hulstrand Const. Co.

Laurie J. Loveland (argued), Sol. Gen., Atty. General's Office, Bismarck, for defendant and appellee State of N.D.

Jeffrey White, Associate Gen. Counsel, Ass'n of Trial Lawyers of America, Washington, D.C. and David R. Bossart, of Conmy, Feste, Bossart, Hubbard & Corwin, Ltd., Fargo, for amicus curiae, Ass'n of Trial Lawyers of America. Brief filed.

LEVINE, Justice.

Judy Ann Bulman appeals from a summary judgment dismissing her wrongful death action against Hulstrand Construction Company and the State of North Dakota. We affirm the dismissal of Hulstrand. However, we hold that Art. I, § 9, N.D. Const., does not bestow exclusive authority upon the Legislature to waive or modify sovereign immunity of the State from tort liability and does not preclude this Court from abolishing that common-law doctrine. With limitations expressed in this opinion, we abolish that doctrine. We therefore reverse the dismissal of Bulman's action against the State, and we remand for proceedings consistent with this opinion.

I

On December 20, 1991, Bulman's husband, Lloyd C. Bulman, Jr., was killed in an automobile accident at a road construction site on U.S. Highway 85 near Amidon, North Dakota. When the accident occurred, the State's general contractor, Hulstrand, had suspended work on the construction project for the winter.

Bulman sued the State and Hulstrand, claiming the State negligently failed to inspect and maintain the roadway, warn the traveling public of hazardous conditions, and supervise Hulstrand's work on the project. She alleged Hulstrand negligently failed to correct dangerous driving conditions at the construction site, provide adequate warning signs, and comply with the duties imposed by its contract with the State.

The district court granted summary judgment for the defendants, concluding that sovereign immunity barred Bulman's action against the State,[1] and that, under its contract with the State, Hulstrand had no duty

---

1. We dismissed an interlocutory appeal from the summary judgment dismissal of the State on the ground that the N.D.R.Civ.P. 54(b) certification was improvidently granted. *Bulman v. Hulstrand Construction Co., Inc.,* 503 N.W.2d 240 (N.D.1993).

because the State, not Hulstrand, had control over the construction site during the winter suspension. Bulman appealed.

## II

### A

Bulman asserts that sovereign immunity for tort actions against the State should be judicially abolished. The State responds that Art. I, § 9, N.D. Const., authorizes only the Legislature to modify or waive the State's sovereign immunity and, because the Legislature has not done so for torts, the district court properly granted summary judgment dismissal of Bulman's action.

Sovereign immunity is a common-law doctrine which originated in court decisions. *E.g., Nieting v. Blondell,* 306 Minn. 122, 235 N.W.2d 597 (1975); *Worthington v. State,* 598 P.2d 796 (Wyo.1979). *See Kitto v. Minot Park District,* 224 N.W.2d 795 (N.D.1974). This case involves a fresh look at whether Art. I, § 9, N.D. Const., has elevated that common-law doctrine to a constitutional prohibition of suits against the State, which can only be waived by the Legislature.

Art. I, § 9, N.D. Const., was included in the North Dakota Constitution of 1889[2] as part of its declaration of individual rights. It says: .

> "All courts shall be open, and every man for any injury done him in his lands, goods, person or reputation shall have remedy by due process of law, and right and justice administered without sale, denial or delay. Suits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct."

Although the first sentence of Art. I, § 9, N.D. Const., is not absolute in that it does not require a remedy for every alleged wrong, we have said that it does guarantee an important substantive right—the right of access to courts for the redress of wrongs. *Hanson v. Williams County,* 389 N.W.2d 319 (N.D.1986); *Andrews v. O'Hearn,* 387 N.W.2d 716 (N.D.1986). Juxtaposed against

this grant of an important substantive right is the limitation of the second sentence that "[s]uits may be brought against the state in such manner, in such courts, and in such cases, as the legislative assembly may, by law, direct." Historically, this Court has interpreted that limitation broadly to provide a constitutional basis for sovereign immunity, which can only be modified or waived by the Legislature. *See Leadbetter v. Rose,* 467 N.W.2d 431 (N.D.1991); *Schloesser v. Larson,* 458 N.W.2d 257 (N.D.1990); *Dickinson Public School District v. Sanstead,* 425 N.W.2d 906 (N.D.1988); *Patch v. Sebelius,* 320 N.W.2d 511 (N.D.1982); *Senger v. Hulstrand Const., Inc.,* 320 N.W.2d 507 (N.D. 1982); *Kitto v. Minot Park District,* 224 N.W.2d 795 (N.D.1974); *Wright v. State,* 189 N.W.2d 675 (N.D.1971); *Spielman v. State,* 91 N.W.2d 627 (N.D.1958); *Dunham Lumber Co. v. Gresz,* 70 N.D. 455, 295 N.W. 500 (1940); *State ex rel. Shafer v. Lowe,* 54 N.D. 637, 210 N.W. 501 (1926); *Wirtz v. Nestos,* 51 N.D. 603, 200 N.W. 524 (1924). Recently, however, the underlying basis for that interpretation has been questioned. *Leadbetter* (Meschke, J., dissenting); *Schloesser* (Meschke, J., dissenting); *Sanstead* (Meschke, J., concurring). *See Note, Sovereign Immunity: An Outdated Doctrine Faces Demise in a Changing Judicial Arena,* 69 N.D.L.Rev. 401 (1993).

*Wirtz* was our first reported decision discussing suits against the State in the context of that constitutional provision. In that case, unsecured depositors of insolvent, closed banks brought a proceeding in equity against the Depositors' Guaranty Fund Commission to compel the Commission to fully reimburse the depositors. The trial court granted a demurrer to the complaint. On appeal, the primary issue was whether the 1917 Guaranty Fund Law gave the depositors a vested right to full reimbursement of their claims in the chronological order that the insolvent banks closed, or whether a 1923 amendment, which modified the law to allow the Commission to prorate reimbursement, governed the depositor's claims. The depositors contend-

---

**2.** This provision, formerly numbered Article 1, § 22, was renumbered in 1981 pursuant to legis- lative mandate. N.D.C.C. § 46–03–11.1.

ed that, as a matter of law, depositors in banks that closed before the 1923 amendment were entitled to full reimbursement from the fund in the chronological order that the banks closed. This Court held that the depositors had no vested right to have their claims paid under the 1917 law. The Court then discussed the suability of the Commission and said that it was "an arm or a branch of the executive department of the state in executing a specific legislative policy, and is not suable without the consent of the state." *Wirtz, supra,* 200 N.W. at 531. The Court sustained the demurrer to the depositors' complaint for injunctive relief against the Commission, stating that neither the 1917 nor 1923 law authorized suits against the Commission for any matters arising out of the Commission's administration of the law. But the Court cautioned:

"Nothing that has been said can be construed as a holding that a depositor may not in a proper case proceed against the guaranty fund commission or its officers. It is not intended to be held that a depositor or other person may under no circumstances maintain an action in the proper forum, having for its object to require the guaranty fund commission or its officers to perform an official or legal duty not of a governmental character, owing to a class of persons of whom such depositor or person is a member. While the rule is that a suit cannot be maintained against the sovereign without its consent, it is equally well established that a clear official duty, not involving the exercise of discretion, may be enforced when performance thereof is arbitrarily refused, and that, if a person will receive injury because an official is about to violate an official or legal duty, for which adequate compensation cannot be had at law, such conduct may be enjoined. . . .

"In order to guard against misconception' or misunderstanding as to the legal effect of our conclusions, it should be reiterated that the guaranty fund commission is not, by this decision, put beyond or above the law and the Constitution. The rights of the citizen to due process, to the maintenance of the legal sanctity of the obligation of a contract, to the equal pro-

tection of the law, and to the enjoyment of the rights guaranteed by the Constitution of the state and of the nation, will be open to vindication, and their violation to redress against the commission, no less than against any person, natural or artificial. Neither the guaranty fund commission nor any officer may, under our legal system, set the Constitution at defiance; officers and private individuals alike must obey it and respect the rights of persons thereunder. No such rights are in jeopardy in the case at bar, and, if any such rights be endangered by the commission in the future, no injured person will be denied the redress or the remedies to which he is entitled under the fundamental law of the land."

*Wirtz, supra,* 200 N.W. at 534–35.

The effect of this Court's decision in *Wirtz* was to bar suits against the State to compel or enjoin performance of an official duty of a discretionary nature; however, *Wirtz* assures us that injured persons will not be denied redress or remedies under the fundamental law of the land. Subsequent decisions involving actions to enjoin law enforcement officials from enforcing a criminal conviction, *State ex rel. Shafer v. Lowe,* and to foreclose a mechanic's lien on a house in which the State had an interest, *Dunham Lumber Co. v. Gresz,* have stated the principle that the right to maintain a suit against the State exists only as provided by the Legislature.

In the first reported appeal of a tort action against the State, *Spielman, supra,* 91 N.W.2d at 630, this Court, without acknowledging the assurances made in *Wirtz,* said:

"The power to waive the state's governmental immunity from suit rests in the legislature. *State ex rel. Shafer v. Lowe,* 54 N.D. 637, 210 N.W. 501; *Dunham Lumber Co. v. Gresz,* 70 N.D. 455, 295 N.W. 500.

"'The rule is well settled that the state, unless it has assumed such liability by constitutional mandate or legislative enactment, is not liable for injuries arising from the negligent or other tortious acts or conduct of any of its officers, agents, or servants, committed in

the performance of their duties. In other words, the doctrine of respondeat superior does not apply to sovereign states unless through their legislative departments they assume such liability voluntarily.' 49 Am.Jur., States, Territories and Dependencies, Sec. 76."

While citing only secondary authority, *Spielman* extended the prohibition of suits against the State to enjoin or compel performance of governmental actions in *Wirtz* and *Lowe* to preclude tort actions against the State unless authorized by the Legislature. *See also Wright v. State,* 189 N.W.2d 675 (N.D.1971).

In *Kitto, supra,* 224 N.W.2d at 801, 803, this Court abolished governmental immunity from tort liability for political subdivisions:

"We are persuaded that a reconsideration of the constitutional basis for governmental immunity establishes that this doctrine, as distinguished from sovereign immunity of the state itself, is not constitutionally mandated.

\* \* \* \* \* \*

"The matter of sovereign immunity of the state itself, which is untouched by this decision, is one on which we would solicit legislative action. The injustices of state immunity remain for one who is injured by the wrongful act of the state government. In many states where the immunity doctrine has been abolished, some legislative modification or adjustment has been made."

In *Senger,* this Court considered whether it could judicially abolish the doctrine of sovereign immunity from tort liability. We said that *Kitto* "intimated that the doctrine of sovereign immunity is constitutionally mandated" and construed:

"Article I, § 9, of the North Dakota Constitution as a delegation to the Legislature of the power to regulate the State's amendability [sic] to suit and not as an invitation to the court to invade that domain. *See Worthington, supra* 598 P.2d at 804.

\* \* \* \* \* \*

"Article I, § 9 of the North Dakota Constitution entrusts the matter of sovereign immunity to the Legislative Assembly."

*Senger, supra,* 320 N.W.2d at 509, 510.

*Senger* and subsequent decisions have effectively construed Art. I, § 9, N.D. Const., to mean that only the Legislature can modify or waive sovereign immunity from tort liability. *Leadbetter, supra; Schloesser, supra; Sanstead, supra.* In *Leadbetter,* a majority of this Court said that, in the context of suits against the State, the second sentence of Art. I, § 9, N.D. Const., limits the remedy language of the first sentence by entrusting the matter of sovereign immunity to the Legislature. The *Leadbetter* majority thus refused to judicially abolish the State's sovereign immunity from tort liability. To the extent that this Court's prior decisions elevated the common-law doctrine of sovereign immunity to a constitutional prohibition of suits against the State and interpreted Art. I, § 9, N.D. Const., to mean that only the Legislature can modify or waive sovereign immunity, we believe those decisions misconstrued that provision and ignored the assurances in *Wirtz, supra.* We now overrule those decisions.

■ In construing Art. I, § 9, N.D. Const., our overriding objective is to give effect to the intent and purpose of the people who adopted it. *State v. City of Sherwood,* 489 N.W.2d 584 (N.D.1992). The intent and purpose of a constitutional provision is to be determined, if possible, from the language itself. *Johnson v. Wells County Water Resource Board,* 410 N.W.2d 525 (N.D.1987). In construing constitutional provisions, we apply general principles of statutory construction, giving effect and meaning to every word, phrase, and sentence and harmonizing, if possible, potentially conflicting provisions. *City of Sherwood, supra.*

■ Art. I, § 9, N.D. Const., is part of our Constitution's declaration of individual rights and explicitly guarantees that "[a]ll courts shall be open, and every man for any injury ... shall have remedy by due process of law, and right and justice administered without sale, denial or delay." *See Wirtz, supra.* Although the second sentence has been construed to limit that guarantee, there is no

plain and unequivocal language in that sentence which says that *no* suits can be brought against the State without authorization by the Legislature, or that *only* the Legislature can modify or waive the common-law doctrine of sovereign immunity. *Perkins v. State*, 252 Ind. 549, 251 N.E.2d 30 (1969). On its face, the second sentence is neutral in that it neither mandates nor prohibits a substantive rule of absolute sovereign immunity. *Mayle v. Pennsylvania Dept. of Highways*, 479 Pa. 384, 388 A.2d 709 (1978).[3] Instead, subject to other constitutional limitations, that sentence merely authorizes the Legislature to direct the manner, the courts, and the cases in which suits may be brought against the State. We believe that permissive language recognized that, when our Constitution was initially adopted, the existing common-law doctrine was that states were immune from suit. In that context, the second sentence merely authorizes the Legislature to waive or modify

that common-law doctrine if it saw fit. It does not preclude this Court from also abolishing the common-law doctrine if that doctrine no longer meets the needs of the time.

We believe that much more specific and unequivocal language than the permissive language in the second sentence of Art. I, § 9, N.D. Const., is required to defeat the important substantive rights so plainly guaranteed by the first sentence of that provision. Nothing in that provision elevates the common-law doctrine of sovereign immunity to constitutional status, or precludes this Court from abolishing that common-law doctrine.[4] To the extent our prior decisions hold otherwise, we believe they were wrong, and we explicitly overrule them. We conclude that, when read in its entirety and after harmonizing every word, sentence, and phrase, Art. I, § 9, N.D. Const., does not preclude this Court from judicially abolishing the common-law doctrine of sovereign immunity, if appropriate.[5]

3. The source of N.D. Const., Art. I, § 9, has been attributed to "Constitutions generally." Meschke & Spears, *Model Constitution (Peddrick Draft # 2, 1889)*, 65 N.D.L.Rev. 415, 481 (1989). However, our constitutional provision is identical to Pennsylvania's constitutional provision, and the Pennsylvania Supreme Court's interpretation that its constitutional provision does not prohibit judicial abrogation of sovereign immunity is particularly noteworthy.

4. The dissent calls our interpretation of Art. I, § 9, N.D. Const., a flimsy theory and worse, and characterizes our decision as contrary to the separation of powers doctrine. However, it is the "essence of judicial duty" for courts to act as the ultimate interpreters of the constitution. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). Here, we exercise that duty and interpret our constitution in a manner that recognizes the primary importance of the individual rights guaranteed by the first sentence of Art. I, § 9, N.D. Const., and authorizes the Legislature to direct the manner, the courts, and the cases in which suits may be brought against the State.

Read together, the two sentences of Art. I, § 9, must imply *some* legislative power to regulate claims against the State but not unlimited power to veto all claims against the State and thereby write out the first sentence. The Declaration of Rights is meant to limit the power of the State, not expand it, and Art. I, § 9, is part of our Declaration of Rights.

5. In analyzing the identical language in Pennsylvania's constitution, one scholar has concluded that the use of the word "suits" indicates an

intent to limit the State's immunity to "suits in equity" unless the Legislature directs otherwise and not to grant the State absolute immunity for "actions at law." Sloan, *Lessons in Constitutional Interpretation: Sovereign Immunity in Pennsylvania*, 82 Dickinson L.Rev. 209 (1978).

According to Professor Sloan, Pennsylvania's constitutional provision
"means that the people are guaranteed access to the courts, except that in matters formerly cognizable in equity in England, the new 'supreme' executive is protected from our traditional law courts doing equity business that might otherwise restrain his action by way of injunction or mandamus or the like. To assure this state of affairs the following is guaranteed: first, there will be no chancellors to sell, delay or deny justice for the people. Second, article V, section 6 protects the governor in his function from law judges doing equity. Third, the legislature assumes the king's former prerogative of granting a petition of right and can delegate this function and the function of acting on the petition (a right the legislature had in 1789) to an article V court, which will act in such manner, courts, and cases as the legislature directs in *particular* (petition of right) or general classes of cases (i.e., equity suits). Fourth, the only prerogative left in the king from the English law is the pardon power. The citizens and the federal government have the rest, except as specified in this constitution. Fifth, English law immunities are retained for legislators and the removable judges, and a limited 'equitable immunity' as understood in Pennsylvania, goes to the governor only. Last,

## B

Historically, the doctrine of sovereign immunity has been justified on the grounds that the King could do no wrong, the diversion of funds required for other governmental purposes could bankrupt the State and retard its growth, the State could perform its duties more efficiently and effectively if it were not faced with the threat of a floodgate of actions involving tort liability, and it was more expedient for an individual to suffer than for society to be inconvenienced. *See Kitto, supra; Shermoen v. Lindsay,* 163 N.W.2d 738 (N.D.1968); *Watland v. North Dakota Workmen's Compensation Bureau,* 58 N.D. 303, 225 N.W. 812 (1929); *State ex rel. Shafer v. Lowe,* 54 N.D. 637, 210 N.W. 501 (1926); *Vail v. Town of Amenia,* 4 N.D. 239, 59 N.W. 1092 (1894).

■ Whatever justifications initially existed for sovereign immunity, they are no longer valid in today's society. Few principles of modern law have been so uniformly and soundly criticized. *See, e.g., Kitto, supra.* Sovereign immunity from tort liability, like the governmental immunity for political subdivisions at issue in *Kitto,* perpetuates injustice by barring recovery for tortious conduct merely because of the status of the wrongdoer. Sovereign immunity contradicts the essence of tort law that liability follows negligence and that individuals and corporations are responsible for the negligence of their agents and employees acting in the course of their employment. We do not believe it requires laborious analysis to assert that the harshness and inequity of the doctrine of sovereign immunity are counterintuitive to any ordinary person's sense of justice. It is sufficient to comment that, even under the earliest common law of England, sovereign immunity did not produce the harsh results it does today and only rarely did it completely deny relief.[6] We are aware of no persuasive

there are no immunities at law because of the first sentence of article IX, section 11, which makes that sentence inconsistent with any immunity not expressly given."
*Id.* at 255–56.
Professor Sloan's conclusion has support in North Dakota law. Before statehood, the Dakota Territory had abolished the "distinction between actions at law and suits in equity" and denominated a "civil action" as the form of action for the enforcement or protection of private rights and the redress of private wrongs. *Gress v. Evans,* 1 Dak. 387, 46 N.W. 1132 (1877); 1877 Revised Codes of Dakota Territory, Code of Civil Procedure § 33. *See* 1862 Laws of Dakota, Civil Procedure § 3. Nevertheless, the framers of the 1889 Constitution did not use the term "civil action" or "action;" they used the term, "suits," to designate what could not be brought against the State without legislative direction as to manner, courts, and cases. In today's parlance, "suits" is a generic term for actions or proceedings; however, the term was historically limited to "suits in equity" as distinguished from "actions at law." *United States v. Auerbach,* 68 F.Supp. 776 (S.D.Cal.1946); *Miller v. Rapp,* 7 Ind.App. 89, 34 N.E. 125 (1893); *In re Bruns,* 156 Misc. 873, 282 N.Y.S. 617 (1935); 1 Am.Jur. 2d, *Actions* § 4 (1994); Black's Law Dictionary, p. 1434, 6th ed. (1991).

**6.** The California Supreme Court recognized that effect in *Muskopf v. Corning Hospital District,* 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457, 458–59 fn. 1 (1961):
"Sovereign immunity began with the personal prerogatives of the King of England. In the feudal structure the lord of the manor was not subject to suit in his own courts.... The king, the highest feudal lord, enjoyed the same protection: no court was above him.... Before the sixteenth century this right of the king was purely personal.... Only out of sixteenth century metaphysical concepts of the nature of the state did the king's personal prerogative become the sovereign immunity of the state.... There is some evidence that the original meaning of the pre-sixteenth century maxim—that the king can do no wrong—was merely that the king was not privileged to do wrong....
"The immunity operated more as a lack of jurisdiction in the king's courts than as a denial of total relief. There was jurisdiction, however, in the Court of Exchequer 'for equitable relief against the crown. ' * * * the party ought in this case to be relieved against the King, because the King is the fountain and head of justice and equity; and it shall not be presumed, that he will be defective in either. And it would derogate from the King's honour to imagine, that what is equity against a common person should not be equity against him.'
...
"The method for obtaining legal relief against the crown was the petition of right. The action could not be brought in the king's courts because of their lack of jurisdiction to hear claims against him. The petition of right stated a claim against the king, which was barred only by his prerogative. To the petition 'there must always be a reply: "Let right be done," ' ... and ' * * * it is clear that the petition had assumed the character of a definite legal remedy against the Crown.' ... There were procedural difficulties with the pe-

public policy reasons to continue a constitutional interpretation that condones an absolute bar to tort liability.

 Nor does stare decisis justify the perpetuation of an outdated, unforgiving common-law doctrine. In *Kitto*, 224 N.W.2d at 803, this Court quoted with approval Justice Cardozo's lucid explanation of the role of stare decisis:

"But I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law. Perhaps we should do so oftener in fields of private law where considerations of social utility are not so aggressive and insistent. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. In such circumstances, the words of Wheeler, J., in *Dwy v. Connecticut Co.*, 89 Conn. 74, 99 [92 A. 883] express the tone and temper in which problems should be met:

" ' "That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left

tition, but alternate remedies existed in large

to the legislature." If judges have wofully [sic] misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors.' Cardozo, The Nature of the Judicial Process, pp. 150–152 (1921)."

In other areas, this court has declined to follow outdated common-law principles. *First Trust Co. v. Scheels Hardware*, 429 N.W.2d 5 (N.D.1988) (parental recovery for loss of child's society and companionship); *Hopkins v. McBane*, 427 N.W.2d 85 (N.D. 1988) (damages allowed for loss of society, comfort, companionship and for mental anguish in wrongful death action); *Kitto*, *supra* (governmental immunity for political subdivisions); *Lembke v. Unke*, 171 N.W.2d 837 (N.D.1969) (physician's waiver of physician-patient privilege).

 We conclude that the State's sovereign immunity for tort liability is outdated and is no longer warranted. We expressly overrule our prior cases sustaining that obsolete doctrine, and we join those states that have judicially abolished it. *See Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107 (1963); *Muskopf v. Corning Hospital District*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961); *Evans v. Board of County Commissioners*, 174 Colo. 97, 482 P.2d 968 (1971); *Smith v. State*, 93 Idaho 795, 473 P.2d 937 (1970); *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill.2d 11, 163 N.E.2d 89 (1959), *cert. denied*, 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960); *Perkins v. State*, 252 Ind. 549, 251 N.E.2d 30 (1969); *Board of Commissioners of Port of New Orleans v. Splendour S. & E. Co.*, 273 So.2d 19 (La.1973); *Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975); *Pruett v. City of Rosedale*, 421 So.2d 1046 (Miss.1982); *Jones v. State Highway Commission*, 557 S.W.2d 225 (Mo.1977); *Willis v. Department of Conservation & Economic Development*, 55 N.J. 534, 264 A.2d 34 (1970); *Hicks v. State*, 88 N.M. 588, 544 P.2d 1153 (1975); *Vanderpool v. State*, 672 P.2d 1153 (Okla.1983); *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709

part." [Citations omitted].

(1978); *McCall v. Batson,* 285 S.C. 243, 329 S.E.2d 741 (1985).

### C

■ Although we abolish the State's sovereign immunity from tort liability, our decision should not be interpreted as imposing tort liability on the State for the exercise of discretionary acts in its official capacity, including legislative, judicial, quasi-legislative, and quasi-judicial functions. *See, e.g., Kitto, supra; Nieting, supra; Wirtz, supra. See also* Restatement (Second) of Torts § 895B (1979).

■ Furthermore, although we abrogate the State's sovereign immunity from tort liability, we conclude that abrogation should be prospective so that the Legislature can implement and plan in advance by securing liability insurance, or by creating funds necessary for self-insurance. Accordingly, except as to this case and two contemporaneous cases decided today, *Ferris v. North Dakota Centennial Commission,* 521 N.W.2d 643 (N.D.1994), and *Hosman v. North Dakota State University,* 521 N.W.2d 643 (N.D.1994), we abolish sovereign immunity for claims arising fifteen days after adjournment of the fifty-fourth legislative assembly. *Kitto, supra; see Evans v. Board of County Commissioners, supra; Smith v. State, supra; Jones v. State Highway Commissioner, supra; Willis v. Department of Conservation & Economic Development, supra.*

Because the defense of sovereign immunity is not available to the State, we reverse the summary judgment dismissal of Bulman's action against the State.

### III

Bulman argues that the district court erred in dismissing her action against Hulstrand because its contract with the State imposed an ongoing duty of care to the traveling public. Hulstrand responds that its contract gave the State exclusive control over the construction site and the placement of signs during winter suspension of the construction project.

■ The determinative issue regarding Bulman's action against Hulstrand is wheth-er, during the winter suspension of the construction project, Hulstrand had a duty to the traveling public. *Ebach v. Ralston,* 469 N.W.2d 801 (N.D.1991). Whether a duty exists is a preliminary question of law for the court. *Id.* If Hulstrand had no control over the construction site and project during the winter suspension, it had no duty to the traveling public and summary judgment on the issue of negligence would be proper. *Id.* The resolution of the issues of duty and of control of the construction project during winter suspension requires an interpretation of the contract between the State and Hulstrand. *Patch v. Sebelius,* 349 N.W.2d 637 (N.D.1984).

That contract said:

*"Temporary Suspension.* A temporary suspension of work will not relieve the Contractor of his responsibility for maintaining and protecting traffic. When operations are suspended for the winter or are indefinitely suspended by the Engineer for reasons beyond the Contractor's control, the roadway and the traffic control devices will be maintained by the Department at its expense.

"Before suspending operations for the winter, the Contractor shall construct adequate approaches to all crossroads or intersecting roads which have been disturbed by construction operations. He shall provide access to the roadway from abutting property. Warning signs, barricades, and other traffic control devices shall be erected (or existing devices removed) as directed by the Engineer."

■ That provision unambiguously says that during winter suspension of the project, the site was to be "maintained by the Department," and warning signs could only be erected "as directed by the Engineer." It is undisputed that this accident occurred when work on the construction project had been suspended for the winter. *Compare Patch v. Sebelius, supra* (under contract, general contractor had general ongoing duty to the traveling public during temporary suspension of project). Under the contract, Hulstrand did not have control over the construction site during suspension of the construction project

for the winter. Hulstrand therefore did not have a legally enforceable duty to the traveling public, and summary judgment dismissal of Bulman's action against it was proper.

## IV

We affirm the summary judgment dismissal of Hulstrand, reverse the summary judgment dismissal of the State, and remand for further proceedings consistent with this opinion.

NEUMANN and SANDSTROM, JJ., and BERT L. WILSON, Surrogate Judge, concur.

BERT L. WILSON, Surrogate Judge, sitting in place of MESCHKE, J., disqualified.

SANDSTROM, Justice, concurring.

In America, we hold that government receives its powers from the people, not that people receive their rights from government. This idea is embodied in our Declaration of Independence. The concept of sovereign immunity harkens back to an older idea—one inconsistent with our American democracy.

While the legislature may reasonably regulate suits, as it has done for political subdivisions, suits cannot be barred based on "the immunity of kings."

VANDE WALLE, Chief Justice, dissenting.

I dissent. By the sleight-of-hand of reducing the constitutional provision prohibiting suits against the State to a "common-law doctrine" the majority arrogates to itself the authority to set aside the North Dakota Constitution because "that doctrine no longer meets the needs of the time."

I shudder when I think of how many other Constitutional provisions (protections?) are rooted in "common-law doctrine" and are now subject to being summarily dismissed by the courts as "common-law doctrines" which "no longer meet the needs of the time", or are, in the opinion of a few judges, "outdated [and] no longer warranted."

Article I, Section 9 of the North Dakota Constitution straightforwardly gives the Legislature the power to permit suits against the State. I do not analyze all the decisions which hold that sovereign immunity is a part of the North Dakota Constitution and recognize the legislative—not judicial—power to abrogate that immunity. Those decisions, cited in the majority opinion, are neither few in number, obscure, nor ancient. *See, e.g., Leadbetter v. Rose,* 467 N.W.2d 431 (N.D. 1991). Those decisions expressly reject the theory the majority today espouses. Those decisions and their rationale are summarily dismissed under the guise that they "elevated the common-law doctrine of sovereign immunity to a constitutional prohibition of suits against the State." A better characterization is that the electors of this State did so on October 1, 1889, when they adopted the Constitution of North Dakota. The decision of those electors has stood until today, when the majority "judicially abolishes" a provision of the Constitution.

Sovereign immunity may have its roots in the common law. Nothing ordains that a constitution must be brand new theory. Except as an excuse for judges to ignore constitutional provisions they find personally unacceptable, it makes little difference that the provision had its roots in common law. Once it is embedded in our Constitution, its status is the same as any other provision of the North Dakota Constitution. *See, e.g., State v. Rivinius,* 328 N.W.2d 220 (N.D.1982), *cert. denied* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983) [State constitutional provisions have equal standing].

The majority, following the grammatical contortions in *Mayle v. Pennsylvania Dept. of Highways,* 479 Pa. 384, 388 A.2d 709 (1978), concludes that the second sentence of Article I, § 9, N.D. Const., "merely authorizes the Legislature to waive or modify that common-law doctrine if it saw fit." That is indeed a surprise. Are we to now assume that the Legislature has the authority to set aside common-law doctrines or judicially adopted doctrines only when expressly authorized by the Constitution? Such a conclusion is contrary to the separation of powers we have recognized as inherent in our Constitution. *See, e.g., State v. Kainz,* 321 N.W.2d 478 (N.D.1982) [Legislature has ple-

nary authority except as limited by the Constitution]. The conclusion that the Constitution must specifically authorize the abrogation of a common-law doctrine is also contrary to reality. *See* section 1–01–06, NDCC, "[i]n this state there is no common law in any case where the law is declared by the Code."

It seems to me the majority's rationale is self-defeating. It takes no specific constitutional provision to authorize the Legislature to abrogate the common law. Thus, the reason the second sentence of Article I, § 9, is included is to give immunity to the State, not to authorize the Legislature to abrogate what it already had the authority to abrogate, but for the constitutional immunity provision. Indeed, without the second sentence, the first sentence of section 9 would be a powerful weapon against sovereign immunity notwithstanding our decisions that it eventually establishes the right of access to courts for the redress of wrongs. *Andrews v. O'Hearn,* 387 N.W.2d 716 (N.D.1986). It is clear that the second sentence of the section is an exception to the first sentence. I suggest that the repeal of the second sentence of section 9 by constitutional amendment would be viewed as repealing sovereign immunity without further action by the judiciary or the Legislature.

Equally ill conceived is the idea that the provision somehow gives both the legislative and judicial branches the authority to abrogate sovereign immunity. *See, e.g., State ex rel. Spaeth v. Meiers,* 403 N.W.2d 392 (N.D. 1987) [creation of three branches of government by State Constitution implies *exclusion* of each branch from the exercise of the functions of the others].

The flimsy theory upon which the majority relies is perhaps best illustrated by the suggestion in footnote 4, relying on a law review article on the Pennsylvania Constitution, that the use of the word "suits" in Article I, Section 9, refers to "suits in equity." I fail to see how, as the majority states, that conclusion has support in North Dakota law. As the majority notes, prior to the adoption of the Constitution in 1889, the Dakota Territory had abolished the distinction between ac-

tions at law and suits in equity at least some 27 years earlier in 1862. It is illogical to attribute a stylized meaning to the word "suits" in view of that action.

I agree stare decisis should not perpetuate outmoded judicial doctrines.[1] But that agreement has no application to constitutional provisions. The authority of the judiciary does not extend to setting aside an express constitutional provision. Indeed, if there is a place for stare decisis it should be to adhere to well established precedent construing the meaning of a constitutional provision. Stare decisis is of greatest importance where the construction of a provision of the Constitution itself is concerned. 20 Am.Jur.2d Courts § 197. Some courts hold to the contrary because errors in construing the constitution cannot be corrected by the Legislature, only by the court. *Id.* In this instance, however, the Legislature is specifically authorized to abrogate constitutional immunity. Indeed, for whatever it matters, my personal belief is that the Legislature should allow suits against the State with certain limitations. However, to my knowledge there has been no substantial effort in the Legislature to enact such legislation nor have the electors used their initiative powers under Article III of the North Dakota Constitution, a power which the electors readily use when they feel strongly on an issue, to authorize such actions.

In *Dickinson Public School Dist. v. Sanstead,* 425 N.W.2d 906, 911 (N.D.1988), Justice Meschke, concurring, referred to sovereign immunity as a "hallmark of totalitarianism ... contrary to our constitutions." If that be so, and I do not understand how the constitution can be contrary to the constitution, even more totalitarian and infinitely more dangerous is an unprincipled judiciary who contrives theories to overrule precedent and set aside constitutional provisions with which it does not agree.

I would affirm the entire judgment of the district court.

---

1. Some might argue that judicial immunity, which, if found in the Constitution, is not nearly as specific as sovereign immunity, might be a better candidate for judicial activism.